[No. 85697-4. En Banc.]
Argued January 10, 2012. Decided June 21, 2012.

LEASA LOWY, *Respondent*, v. PEACEHEALTH, ET AL., *Petitioners*.

*Mary H. Spillane* and *Daniel W. Ferm* (of *Williams Kastner & Gibbs PLLC*) and *John C. Graffe Jr.* (of *Johnson Graffe Keay Moniz*), for petitioners.

*Joel D. Cunningham* and *J. Andrew Hoyal II* (of *Luvera Law Firm*) and *Michael J. Myers* (of *Michael J. Myers PLLC*), for respondent.

*Michael F. Madden* on behalf of Washington State Hospital Association, Group Health Cooperative, Multicare Health System, Providence Health & Services, Seattle Children's Hospital, and Swedish Health Services, amici curiae.

*Bryan P. Harnetiaux* and *George M. Ahrend* on behalf of Washington State Association for Justice Foundation, amicus curiae.

¶1 CHAMBERS, J. — This case presents the issue of whether, in civil litigation, a party may decline to produce requested discoverable information on the basis that to locate the information would require consulting privileged

documents. A hospital seeks a protective order to prevent it from being required to review its quality assurance records to identify discoverable medical records in a medical negligence suit. Our policy favoring open discovery requires that privileges in derogation of the common law must be narrowly construed. We hold that the prohibition of "review" in Washington's quality improvement statute, RCW 70.41-.200, refers to external review and not internal review. We hold that the hospital's consultation of its own privileged database to identify relevant, discoverable files that fall outside of the privilege will not violate the hospital's privilege. We affirm the Court of Appeals and reverse the trial court.

## FACTS

¶2 Dr. Leasa Lowy MD, a staff physician at St. Joseph's Hospital in Bellingham, Washington (a hospital owned and operated by PeaceHealth), was admitted to the hospital as a patient. While a patient, Lowy sustained ulna nerve damage causing serious permanent impairment to her left arm. She claims that she can no longer practice her specialties of obstetrics, gynecology, and surgery. Lowy contends her injury was the result of an improper intravenous (IV) infusion procedure.

¶3 Lowy testified that she became aware of about 170 IV injuries at the hospital when she saw a list on a computer screen giving details of IV injuries with the patient names replaced by identification numbers.[1] Contending the hospital has a serious and systemic problem with IV infusion injuries, Lowy brought a medical negligence action, alleging, among other things, corporate negligence on the part of the hospital.

---

[1] There is a dispute as to how Lowy came to have the information. She contends it was volunteered to her by a co-worker and the hospital contends it was provided to her because Lowy was a member of the quality and safety leadership team and entitled to access the quality assurance database.

¶4 In connection with her theory of corporate negligence, Lowy sought to obtain, through a deposition under CR 30(b)(6), information relating to instances of "IV infusion complications and/or injuries at St. Joseph's Hospital for the years 2000-2008." Clerk's Papers (CP) at 21. It is undisputed that the requested information is within the hospital's records and is relevant and otherwise discoverable. The patient records are maintained by the hospital electronically but the hospital does not have the capability to electronically search the records. The hospital moved for a protective order as to Lowy's request. It argued that the deponent requested by Lowy would have to locate the information by going through thousands of patient files by hand. The hospital contended, and Lowy conceded, that an individual search of all of the hospital records for a nine-year period would be unduly burdensome.

¶5 But Lowy pointed out the list she had seen, created for quality assurance purposes, identified instances of IV infusion injuries. Lowy suggested that it would not be unduly burdensome for the hospital to consult that list to locate the relevant patient files and produce only the relevant patient files after redacting sensitive patient information. The hospital acknowledged the existence of the list but argued that the list itself was created for PeaceHealth's "Cubes" database, which contains information derived from incident reports and maintained for the sole purpose of quality review. Because the list itself was prepared for purposes of quality assurance by its quality improvement committee and is thus protected from discovery, the hospital claimed it could not be required to use the list to locate items not protected from discovery. Lowy argued that the statutory protections for quality assurance information do not prevent the hospital from conducting an internal review of its quality improvement committee information in order to locate unprotected information. Because such a review would allow the hospital to produce relevant discoverable information without undue burden, Lowy ar-

gued that the hospital was required to produce the information. The trial court first agreed with Lowy but then granted the protective order on a motion for reconsideration by the hospital. The Court of Appeals reversed the protective order, *Lowy v. PeaceHealth*, 159 Wn. App. 715, 247 P.3d 7 (2011), and we granted review, *Lowy v. PeaceHealth*, 171 Wn.2d 1027, 257 P.3d 662 (2011).

## ANALYSIS

### I. PEER REVIEW AND HOSPITAL QUALITY ASSURANCE

¶6 The legislature has established a comprehensive peer review schema to improve health care in Washington State. The general purpose of the peer review statute is to encourage health care providers to candidly review the work and behavior of their colleagues to improve health care. *See Coburn v. Seda*, 101 Wn.2d 270, 275, 279, 677 P.2d 173 (1984). RCW 4.24.250 was the first of these peer review statutes; it was enacted in 1971 and prohibited discovery of records of internal proceedings where one member of the health care profession presents evidence of negligence or incompetence against another. LAWS OF 1971, 1st Ex. Sess., ch. 144. Following the passage of the federal Health Care Quality Improvement Act of 1986, 42 U.S.C. §§ 11101-11152, many more states passed peer review statutes in response. *See* David L. Fine, Note, *The Medical Peer Review Privilege in Massachusetts: A Necessary Quality Control Measure or an Ineffective Obstruction of Equitable Redress?*, 38 SUFFOLK U. L. REV. 811, 821 (2005). One such statute was RCW 70.41.200, enacted by the Washington legislature in 1986.[2] LAWS OF 1986, ch. 300, § 4. More complex than the

---

[2] Congress also passed the Patient Safety and Quality Improvement Act in 2005, 42 U.S.C. §§ 921-926, to encourage voluntary reporting by health care providers. *See* Eric Scott Bell, Comment, *Make Way: Why Arkansas and the States Should Narrow Health Care Peer Review Privileges for the Patient Safety and Quality Improvement Act of 2005*, 62 ARK. L. REV. 745, 746-47 (2009). That act is not implicated in this case.

1971 statute, it set forth a quality improvement scheme for hospitals, while at the same time protecting certain quality improvement records from discovery. RCW 70.41.200. Under this scheme, hospitals are required, among other things, to establish a coordinated quality improvement program, a quality improvement committee, and a medical malpractice prevention program; to collect information concerning negative health care outcomes; and to conduct periodic review of the competence in delivering health care services of all persons who are employed or associated with the hospital.[3] *Id.*

¶7 The legislature was concerned that if the data and other information generated by quality improvement committees could be used against a hospital, it would create a disincentive for hospitals to report effectively and evaluate candidly information concerning the hospital's experience.[4] *See Anderson v. Breda*, 103 Wn.2d 901, 905, 700 P.2d 737 (1985). To ensure a candid discussion about the quality of health care by hospitals, the legislature shielded from discovery a hospital's quality review committee records. *Id.* We have explained that such protection, "like work product immunity, prevents the opposing party from taking advan-

---

[3] Patient safety is a continuing concern of the State. As reported by the Institute of Medicine in 2000, medical error has a staggering effect in the United States. Between 44,000 and 98,000 people lose their lives every year in hospitals due to preventable medical errors. COMM. ON QUALITY OF HEALTH CARE IN AM., INSTITUTE OF MEDICINE, TO ERR IS HUMAN: BUILDING A SAFER HEALTH SYSTEM 26 (Linda T. Kohn et al. eds., 2000), *available at* http://www.nap.edu/catalog/9728.html.

[4] Peer review and confidentiality are not universally accepted as the best approach to preventing hospital negligence. Commentators have observed that peer review committees can be highly political and easily manipulated. Yann H.H. van Geertruyden, *The Fox Guarding the Henhouse: How the Health Care Quality Improvement Act of 1986 and State Peer Review Protection Statutes Have Helped Protect Bad Faith Peer Review in the Medical Community*, 18 J. CONTEMP. HEALTH L. & POL'Y 239, 252 (2001). Studies have called into question whether peer review in its current form is actually effective in improving quality of care at all. *See generally* Ronald L. Goldman, *The Reliability of Peer Assessments of Quality of Care*, 267 JAMA 958 (1992). Some commentators have suggested a completely objective review by independent parties would more effectively eradicate medical errors. Fine, *supra*, at 829. Evaluating all of these considerations, the Washington Legislature adopted a scheme of peer review as the best way to improve patient care and safety.

tage of a hospital's careful self-assessment. The opposing party must utilize his or her own experts to evaluate the facts underlying the incident . . . to determine whether the hospital's care comported with proper quality standards." *Coburn*, 101 Wn.2d at 274.

## II. DISCOVERY RIGHTS AND PEER REVIEW

¶8 The right of discovery and the rules of discovery are integral to the civil justice system. *See John Doe v. Puget Sound Blood Ctr.*, 117 Wn.2d 772, 782-83, 819 P.2d 370 (1991). Access to the civil justice system is founded upon our constitution, which mandates that "[j]ustice in all cases shall be administered openly, and without unnecessary delay." WASH. CONST. art. I, § 10. As we explained in *Doe*:

> That justice which is to be administered openly is not an abstract theory of constitutional law, but rather is the bedrock foundation upon which rest all of the people's rights and obligations. In the course of administering justice the courts protect those rights and enforce those obligations. Indeed, the very first enactment of our state constitution is the declaration that governments are established to protect and maintain individual rights.

*Doe*, 117 Wn.2d at 780-81 (citing WASH. CONST. art. I, § 1).

¶9 The right of access to the courts is closely tied to the command in article I, section 10 of our constitution that justice be administered openly. *Id.* The "right of access includes the right of discovery authorized by the civil rules, subject to the restrictions contained therein." *Id.* at 780. Moreover,

> [t]he court rules recognize and implement the right of access. The discovery rules, specifically CR 26 and its companion rules, CR 27-37, grant a broad right of discovery which is subject to the relatively narrow restrictions of CR 26(c). This broad right of discovery is necessary to ensure access to the party seeking the discovery.

*Id.* at 782.

¶10 Besides its constitutional cornerstone, there are practical reasons for discovery. Earlier experiences with a "blindman's bluff" approach to litigation, where each side was required "literally to guess at what their opponent would offer as evidence," were unsatisfactory. Michael E. Wolfson, *Addressing the Adversarial Dilemma of Civil Discovery*, 36 Clev. St. L. Rev. 17, 22 (1988). As modern day pretrial discovery has evolved, it has contributed enormously to "a more fair, just, and efficient process." *Id.* at 20. Effective pretrial disclosure, so that each side knows what the other side knows, has narrowed and clarified the disputed issues and made early resolution possible. As importantly, early open discovery exposed meritless and unsupported claims so they could be dismissed. It is uncontroverted that early and broad disclosure promotes the efficient and prompt resolution of meritorious claims and the efficient elimination of meritless claims.

¶11 We have never examined RCW 70.41.200, but we have construed similar and related statutes providing immunity or privilege from discovery for medical quality assurance programs. We have noted that these statutes are against the policy of open discovery. We first analyzed a peer review privilege statute in *Coburn*, 101 Wn.2d 270. There the court examined RCW 4.24.250(1), which prohibits "review or disclosure, or subpoena or discovery" of records of internal proceedings where one member of the health care profession presents evidence of negligence or incompetence against another. The trial judge had found the statute applied only to actions between health care providers. *Id.* at 272. We held that the plain language applied to medical malpractice actions in general. *Id.* at 273.

¶12 We were careful to limit the breadth of our holding, however. We said, "As a statute in derogation of both the common law and the general policy favoring discovery, RCW 4.24.250 is to be *strictly construed and limited to its purposes.*" *Id.* at 276 (emphasis added). And further, "[t]he

statute may not be used as a shield to obstruct proper discovery of information generated outside review committee meetings. The statute does not grant an immunity to information otherwise available from original sources." *Id.* at 277.

¶13 We again tackled RCW 4.24.250 in *Anderson*, 103 Wn.2d 901, which held that the statute did not protect information about whether a doctor's privileges had been suspended or terminated. We reiterated many of the points in *Coburn* and stated:

> Although the extent of a physician's hospital privileges may be determined by what occurs within a quality review committee, the fact that a physician's privileges are restricted, suspended or revoked is not properly subject to the protections of the statute. The goal and fundamental purpose of the statute is open discussion during committee investigations. Open discussion is not inhibited by permitting discovery of the effect of the committee proceedings. The purpose of this statute is to keep peer review studies, discussions, and deliberations confidential. A facial examination of the statute reveals that it is not designed to obstruct discovery as to whether a physician's privileges had been revoked or suspended.

*Anderson*, 103 Wn.2d at 907.

¶14 We reaffirmed that quality assurance statutes are to be "strictly construed" in *Adcox v. Children's Orthopedic Hosp. & Med. Ctr.*, 123 Wn.2d 15, 31, 864 P.2d 921 (1993). The strict construction of quality assurance statutes is in accord with the law governing all privileges. "[P]rivileges must be construed narrowly because privileges impede the search for truth." *Versuslaw, Inc. v. Stoel Rives, LLP*, 127 Wn. App. 309, 332, 111 P.3d 866 (2005) (citing *Baldrige v. Shapiro*, 455 U.S. 345, 360, 102 S. Ct. 1103, 71 L. Ed. 2d 199 (1982)). It is with these principles in mind that we examine the statute at issue in this case.

III. STATUTORY CONSTRUCTION OF RCW 70.41.200

¶15 Construction of a statute is a question of law we review de novo. *State v. Wentz*, 149 Wn.2d 342, 346, 68 P.3d

282 (2003). The court's duty in statutory interpretation is to discern and implement the legislature's intent. *State v. J.P.*, 149 Wn.2d 444, 450, 69 P.3d 318 (2003) (citing *State v. Landrum*, 66 Wn. App. 791, 795, 832 P.2d 1359 (1992)). Where the plain language of a statute is unambiguous and legislative intent is apparent, we will not construe the statute otherwise. *Id.* Plain meaning may be gleaned "from all that the Legislature has said in the statute and related statutes which disclose legislative intent about the provision in question." *Dep't of Ecology v. Campbell & Gwinn, LLC*, 146 Wn.2d 1, 11, 43 P.3d 4 (2002). It is fundamental that in construing any statute we avoid absurd results. *Wright v. Jeckle*, 158 Wn.2d 375, 379-80, 144 P.3d 301 (2006) (citing *Glaubach v. Regence BlueShield*, 149 Wn.2d 827, 833, 74 P.3d 115 (2003)).

 ¶16 Turning then to the statute at issue in this case, it states in relevant part:

> Information and documents, including complaints and incident reports, *created specifically for, and collected and maintained by, a quality improvement committee are not subject to review or disclosure, except as provided in this section, or discovery or introduction into evidence in any civil action*, and no person who was in attendance at a meeting of such committee or who participated in the creation, collection, or maintenance of information or documents specifically for the committee shall be permitted or required to testify in any civil action as to the content of such proceedings or the documents and information prepared specifically for the committee.

RCW 70.41.200(3) (emphasis added). By its plain language, RCW 70.41.200(3) protects only information "created specifically for, and collected and maintained by, a quality improvement committee." "[C]reated specifically for" is conjunctive with "collected and maintained." *Id.* Thus, under a plain reading of the statute, information must be created specifically for a quality improvement committee in addition to being collected and maintained by the committee to qualify for protection under the statute.

¶17 However, the hospital focuses on the word "review." *See* RCW 70.41.200(3). The hospital argues that the plain language of the statute prohibits "review" of quality assurance files. *See id.* Therefore, the hospital asserts, it cannot review its quality assurance information to locate patient files that would otherwise be discoverable. Lowy responds that "review" clearly refers to external review, and the statute does not prohibit the hospital from examining its own records. The hospital answers that the statute does not expressly distinguish between internal and external review.

¶18 This court has twice explained that the underlying purpose of these protective statutes is to prevent *external access*. In *Coburn*, we explained, "Statutes . . . prohibit discovery of records on the theory that external access to committee investigations stifles candor and inhibits constructive criticism thought necessary to effective quality review." *Coburn*, 101 Wn.2d at 275. We reiterated the point in *Anderson*, stating, "The Legislature recognized that external access to committee investigations stifles candor and inhibits constructive criticism thought necessary to effective quality review." *Anderson*, 103 Wn.2d at 905. These comments are strong support for Lowy's position that the statute is not intended to prohibit the hospital from reviewing its own records.

¶19 There are two other reasons to reject the hospital's argument that both external and internal review is prohibited by the statute. The first is quite practical. The hospital's interpretation would lead to absurd results. Counsel for the hospital conceded that its position would prohibit the hospital from reviewing its own quality improvement committee records to provide a defense to a medical negligence action.[5] This is a strained construction. Any interpretation that would prevent the hospital from reviewing its own quality assurance records could defeat the very pur-

---

[5] Wash. Supreme Court oral argument, *Lowy v. PeaceHealth*, No. 85697-4 (Jan. 10, 2012), at 7 min., 55 sec. & 40 min., 21 sec., *audio recording by* TVW, Washington State's Public Affairs Network, *available at* http:www.tvw.org.

pose of the statute: to review medical outcomes to evaluate the competence of personnel and improve the quality of health care delivery. *See* RCW 70.41.200(1) (quality improvement program must be maintained "for the improvement of the quality of health care services rendered to patients and the identification and prevention of medical malpractice").

¶20 Second, statutory privileges in general, and health care quality assurance privileges in particular, are not to be used as a mechanism to conceal from discovery otherwise discoverable information. Again, as we said in *Anderson*, such statutes " 'may not be used as a shield to obstruct proper discovery of information generated outside review committee meetings.' " *Anderson*, 103 Wn.2d at 907 (quoting *Coburn*, 101 Wn.2d at 277). We do not mean to suggest that St. Joseph's has attempted to conceal any information; however, its position that it may not consult its quality improvement data in order to comply with discovery in essence amounts to a claim that the statute shields it from having to produce unprotected documents despite the fact they could easily be produced without undue burden. This claim is contrary to the spirit of the rule laid down in *Anderson*. Moreover, it would permit and even encourage a health care provider to require all complaints, incidents of infections, complications, or incident reports of any kind to be created for and thus become quality improvement committee records. Hospitals might also limit the use of search software, databases, and other tools to locate negative outcomes only to its quality improvement committee so as to shield bad results from discovery.

## IV. Legislative History

¶21 Both parties argue that a plain reading of the statute supports their interpretation. For the reasons stated above, we do not consider the hospital's interpretation to be reasonable. However, given the split between the

782

trial court and Court of Appeals below, we will briefly review the legislative history. *Cf. Campbell & Gwinn*, 146 Wn.2d at 12.

¶22 The legislative history of RCW 70.41.200(3) certainly does not support the hospital's interpretation that the word "review" in the statute prohibits both external and internal review. Before 2005, the statute stated:

> Information and documents, including complaints and incident reports, created specifically for, and collected and maintained by a quality improvement committee are not subject to discovery or introduction into evidence in any civil action.

Former RCW 70.41.200(3) (Laws of 1993, ch. 492, § 415). The statute now states:

> Information and documents, including complaints and incident reports, created specifically for, and collected and maintained by, a quality improvement committee are not subject to *review or disclosure, except as provided in this section, or* discovery or introduction into evidence in any civil action.

RCW 70.41.200(3) (emphasis added). Included in one of the reports on the bill that proposed the 2005 change is testimony in favor of adding the emphasized language (which no one testified against). That testimony was given by Lisa Thatcher, a representative of the Washington State Hospital Association (WSHA):

> This bill is an effort to ensure that quality improvement committee protections are still in place even with the potential passage of an initiative that will be on the ballot this fall. It adds protection for quality improvement and peer review committees that do not exist statutorily. This allows open discussion without the fear of the information being released to the public, and provides the opportunity to candidly discuss bad outcomes and near misses. *The public still retains access to the information that goes into the committee and that comes out of the committee, but does not have access to the inner workings of the committee.* This bill is agreed to by the [WSHA] and the Washington State Trial Lawyers.

S.B. Rep. on Engrossed H.B. 2254, at 2 (2005) (emphasis added).

¶23 The comment "the potential passage of an initiative" is a reference to Initiative 336 that was on the 2005 November ballot.[6] Initiative 336 failed to pass but would have permitted patients to examine and make copies of their health care records of any adverse medical incident.[7] The legislative history strongly suggests that the amendment to add the words "review or disclosure" to the statute was not to preclude internal review, but in anticipation of Initiative 336 that would permit patients to review medical records. The legislative change was to address the potential nonjudicial, external review of quality assurance program information at patient request.

¶24 The legislative history also makes clear the WSHA understood that the legislation's purpose had always been and remained to permit "access to the information that goes into the committee and that comes out of the committee, but . . . not . . . the inner workings of the committee." S.B. Rep. on EHB 2254, at 2. We think this statement concisely describes the scope of RCW 70.41.200 and is in accord with our prior interpretations of related statutes. As we have said before, the purpose of the privilege "is to keep peer review studies, discussions, and deliberations confidential." *Anderson*, 103 Wn.2d at 907. It is only the discussion and

---

[6] Wash. Supreme Court oral argument, *supra*, at 39 min., 19 sec.

[7] Initiative 336, section 202, would have amended RCW 7.70.050 to make "failure of a health care provider to disclose, upon patient request, the provider's experience with the treatment, including treatment outcomes" a statutory violation. *State of Washington Voters' Pamphlet*, General Election 50 (Nov. 8, 2005). Section 206 would have provided, "Upon receipt of a written request from a patient or an immediate family member of a deceased or disabled family member to examine or copy records made or received in the course of business by a health care facility or provider relating to any adverse medical incident, the health care facility or provider, as promptly as required by the circumstances, but not later than fifteen working days after receiving the request, shall . . . [m]ake the information available for examination . . . and provide a copy." *Id.* at 51.

784

self-analysis, and materials created specifically to aid in those endeavors, that are subject to the privilege.[8]

■ ¶25 We hold that RCW 70.41.200 limits "review" to external review only. Legislative history supports our holding and suggests that the word "review" was added to prevent nonjudicial review by and disclosure to the public.

## V. STATUTORY PRIVILEGE

¶26 Our rejection of the hospital's plain meaning argument that the statute prevents even internal review does not end our inquiry. The hospital argues that the list or database falls within the statutory privilege extending to "[i]nformation and documents . . . created specifically for, and collected and maintained by, a quality improvement committee." RCW 70.41.200(3). St. Joseph's Hospital contends that it cannot be required to consult a privileged list of unfavorable IV infusion outcomes maintained by its quality improvement committee in order to identify and produce non-quality-improvement committee records it concedes are discoverable. Lowy counters that she is not seeking discovery of the IV injury list, but only the unprivileged records that could be located by the hospital's review of the list. Whether the scope of the statutory privilege prevents the hospital from consulting its undiscoverable list to locate discoverable information is a different question from whether the statute prohibits internal review. It is also a question of first impression in this court and, as far as we can tell, nationwide.

■ ¶27 In enacting RCW 70.41.200, our legislature adopted a peer review approach to improve the quality of health care in Washington hospitals. To encourage frank

---

[8] We note in St. Joseph's initial motion for a protective order, the hospital claimed, citing RCW 4.24.250, that "materials submitted to the quality assurance and peer review committees[ ] are privileged and immune from discovery." CP at 18. The hospital was incorrect. Materials that are not created specifically for a quality review committee, but that are merely collected by a quality review committee, are not subject to the privilege. RCW 70.41.200(3).

and candid discussion, it struck a balance among policy concerns and granted hospitals a privilege from discovery. In essence, the legislature has granted quality improvement committees two privileges. The first shelters communications that take place within the confines of a quality improvement meeting. *See* RCW 70.41.200(3) ("no person who was in attendance at a meeting of [a quality improvement] committee . . . shall be permitted or required to testify in any civil action as to the content of such proceedings"). The second protects documents and information, much like the immunity granted an attorney's work product. *See id.* ("Information and documents . . . created specifically for . . . a quality improvement committee are not subject to . . . discovery.").

■■ ¶28 As a policy matter, because some relationships are deemed so important and cannot be effective without candid communication, courts and legislatures have granted them privilege. But inasmuch as privileges frustrate the search for truth, they are limited in scope so as to accomplish their intended purpose and no more. Thus, the attorney-client, physician-patient, and clergy-penitent privileges are all founded on the premise that communication in these relationships is so important that the law is willing to sacrifice its pursuit for the truth, the whole truth, and nothing but the truth. *See United States v. Nixon*, 418 U.S. 683, 710, 94 S. Ct. 3090, 41 L. Ed. 2d 1039 (1974) ("[T]hese exceptions to the demand for every man's evidence are not lightly created nor expansively construed, for they are in derogation of the search for truth."). But these privileges protect only actual communications and nothing more. *See Hangartner v. City of Seattle*, 151 Wn.2d 439, 452, 90 P.3d 26 (2004) (The attorney-client privilege is a narrow privilege and protects only " 'communications and advice between attorney and client.' " (quoting *Kammerer v. W. Gear Corp.*, 96 Wn.2d 416, 421, 635 P.2d 708 (1981))); 1 McCormick on Evidence § 89, at 402 (Kenneth S. Broun ed., 6th ed. 2006) (Most authority holds that "observations by the lawyer

that might be made by anyone, and which involve no communicative intent by the client, are not protected."). If the client and lawyer choose to meet at the scene of the crime, the location of their meeting is a fact that could be observed by anyone and is not privileged even if it reveals something about their communications.

¶29 In addition to a privilege for the communications, the legislature has created what we have described as something akin to a work product immunity for the documents created specifically for quality improvement committees. *Coburn*, 101 Wn.2d at 274. As we pointed out, "discovery protection granted hospital quality review committee records, like work product immunity, prevents the opposing party from taking advantage of a hospital's careful self-assessment." *Id.* We again find the analogy between the statutory privilege before us and the attorney work product privilege useful.

¶30 The seminal case of *Hickman* is instructive. There the Court held the work product of an attorney was protected from discovery to the extent that it reflected the lawyer's thoughts, mental impressions, legal theories, planning, and strategy. *Hickman v. Taylor*, 329 U.S. 495, 510-11, 67 S. Ct. 385, 91 L. Ed. 451 (1947) (holding statements taken from witnesses by a lawyer were not protected by attorney-client privilege, but were protected from discovery absent a showing of need). Importantly, *Hickman* holds that work product is not protected from discovery in all circumstances; the court notes that production might be justified if, among other things, documents "give clues as to the existence or location of relevant facts." *Id.* at 511. The Court explained that "[w]ere production of written statements and documents to be precluded under such circumstances, the liberal ideals of the deposition-discovery portions of the Federal Rules of Civil Procedure would be stripped of much of their meaning." *Id.* at 511-12. To hold otherwise would permit the lawyer's office to be more than a shield; instead, it would become a fortress wherein the keys to find and unlock all secrets would be secure.

¶31 Here, the hospital's database gives, not clues, but the actual location of relevant facts. It is true that unlike the work product doctrine, the peer review statute at issue does not specifically list any exception to the protection from discovery. RCW 70.41.200(3) ("[i]nformation and documents ... created specifically for ... a quality improvement committee are not subject to ... discovery"). But Lowy is not asking the hospital to produce the database. She is asking the hospital to turn over relevant documents everyone agrees are easily locatable by the hospital's review of the database. The principles of liberal discovery are as important in construing statutory provisions as court-created protections, like the work product doctrine. Here the hospital can easily produce unprotected information without revealing any information protected by the statute. The requested information is completely external to the hospital's "careful self-assessment," and thus there is no reason the hospital should be permitted to deny the request. *Coburn*, 101 Wn.2d at 274.

¶32 As discussed above, "[p]rivileges are narrowly construed to serve their purposes so as to exclude the least amount of relevant evidence." *State v. Burden*, 120 Wn.2d 371, 376, 841 P.2d 758 (1992). Narrow constructions of privileges are necessary because privileges impede the search for truth. *Versuslaw*, 127 Wn. App. at 332; *Baldrige*, 455 U.S. at 360. Again, the purpose of RCW 70.41.200 is twofold: to encourage health care providers to report adverse medical outcomes and to allow them to freely discuss, debate, and analyze the competence and conduct of peers. The privilege does not protect what goes into or comes out of the quality improvement committees. But documents created as part of the inner workings of the committee are privileged and disclosure of those documents may not be compelled.[9] Our legislature did not intend quality improve-

---

[9] Amicus WSHA notes that "[m]any hospitals utilize software packages that submit incident reports electronically and automatically compile the submitted information for review and analysis. In such cases, the incident report and the

ment committees to institutionalize a conspiracy of silence or to create unnecessary barriers to a patient's quest for the truth. Our rules of discovery are grounded upon the constitutional guaranty that justice will be administered openly. *Doe*, 117 Wn.2d at 780-81. Our legislature did not intend that defendants could conceal discoverable documents not created specifically for a quality improvement committee and not privileged by moving electronic search and other identifying tools under a quality improvement committee's umbrella of secrecy. But this sort of hide and seek gamesmanship would be encouraged were we to adopt the hospital's position in this case.[10]

¶33 As the Court of Appeals observed, the plain language of the statute prevents disclosure of the quality review committee records themselves. " 'The discovery protection granted hospital quality review committee records, like work product immunity, prevents the opposing party from taking advantage of a hospital's careful self-assessment.' " *Lowy*, 159 Wn. App. at 721 (quoting *Coburn*, 101 Wn.2d at 274). But the statute is not a shield to obstruct access to records outside the scope of the privilege. The medical records Lowy seeks were not created specifically for the quality improvement committee and are undisputedly relevant and discoverable. The Court of Appeals correctly explains:

> In disclosing [the patient records], the hospital will not be required to disclose who participated in the review process

databases are effectively a single record." Amicus Br. of Wash. State Hosp. Ass'n at 5 n.8. This suggests software is available to search and compile information from medical records. As we have emphasized above, such databases that do not contain the evaluations, assessments, or other inner workings of a quality improvement committee may not be provided only to quality improvement committees so as to frustrate and obstruct discovery. The fact that an IV infusion related injury occurred is information that goes into the committee; it is not part of the inner workings of the committee.

[10] We recently rejected an attempt to shield records from discovery by placing them under the umbrella of another entity in a different context in *Gendler v. Batiste*, 174 Wn.2d 244, 272 P.3d 242 (2012). There we held that the Washington State Patrol could not confer protection on public documents simply by storing them in the same database as protected records.

concerning IV injuries; which incidents the hospital found relevant or important; or how it sorted, grouped, or otherwise organized those incidents. The hospital will not disclose any analysis, discussions, or communications that occurred during the proceedings of the quality assurance committee. The response to the discovery request will reveal no more than if the hospital had produced the medical records through a burdensome page-by-page search.

*Id.* at 722.

¶34 Finally, the burden of disclosure is upon the party who is requested to disclose. Records created for and maintained by quality improvement committees are privileged. If a hospital believes that use of this privileged information to identify unprivileged information will compromise the purpose of the statute to promote candid discussion and careful self-assessment by the hospital of its care of patients, the hospital may seek an appropriate protective order.[11] But under our discovery rules, the burden is on the hospital to *"fully* answer all interrogatories and all requests for production." *Wash. State Physicians Ins. Exch. & Ass'n v. Fisons Corp.*, 122 Wn.2d 299, 354, 858 P.2d 1054 (1993). When a database such as PeaceHealth's Cubes database exists and is relevant to a discovery request, its existence must be disclosed even if the information itself is protected. It is up to the hospital to move for a protective order if it "[does] not agree with the scope of production or [does] not want to respond." *Id.*

## CONCLUSION

¶35 We hold the prohibition against "review or disclosure" in RCW 70.41.200(3) refers to external review and does not preclude a hospital from internally reviewing its own quality improvement committee records. Statutory

---

[11] Our holding clarifies that RCW 70.41.200(3) does not permit a hospital to refuse to review privileged information in order to locate and produce discoverable information. This does not preclude the hospital from seeking an appropriate protective order under the standard procedures laid out in CR 26(c).

privileges in derogation of both common law and constitutional principles favoring broad discovery in the pursuit of truth must be narrowly construed. We conclude the legislature did not intend RCW 70.41.200 to be a fortress where a hospital can hide the keys to locating discoverable information. Absent a protective order, a hospital is required to review its own privileged records to identify relevant discoverable records.

MADSEN, C.J., and C. JOHNSON, OWENS, FAIRHURST, STEPHENS, WIGGINS, and GONZÁLEZ, JJ., concur.

¶36 J.M. JOHNSON, J. (dissenting) — Our legislature has expressed a strong public policy in favor of maintaining the confidentiality of hospital quality assurance records. Confidentiality of this information is necessary to encourage hospitals to engage in candid self-evaluation, which improves the quality of patient care. To foster this policy, we have demanded that medical malpractice plaintiffs develop their cases through "sources other than the records of [a quality improvement] committee," even though this may compromise access to some evidence. *Anderson v. Breda*, 103 Wn.2d 901, 906, 700 P.2d 737 (1985).

¶37 While espousing the merits of open discovery, the majority ignores the important statutory purpose of RCW 70.41.200(3), as well as the statute's plain directive that "[i]nformation and documents . . . created specifically for, and collected and maintained by, a quality improvement committee are not subject to . . . disclosure." PeaceHealth's quality improvement database, including the "list" that Dr. Leasa Lowy mysteriously encountered, plainly qualifies as "information" meeting RCW 70.41.200(3) specifications. It was created and compiled for no other purpose than use by PeaceHealth's quality improvement committee. By ordering the hospital to use its quality improvement database to locate and produce patient records listed therein, the hos-

pital is, in essence, forced to reveal some of the information in the database itself.

## THE PLAIN MEANING OF *RCW 70.41.200(3)*

¶38 In construing a statute, our primary objective is to ascertain and carry out the legislature's intent. *Lake v. Woodcreek Homeowners Ass'n*, 169 Wn.2d 516, 526, 243 P.3d 1283 (2010). We look first to the plain meaning of the statute itself. *Id.* If the statute is unambiguous, our inquiry ends. *Id.* Only if the meaning of the statute remains unclear should we look to external sources. *Id.*

¶39 The meaning of RCW 70.41.200(3) is clear. The statute provides, "Information and documents . . . created specifically for, and collected and maintained by, a quality improvement committee are *not subject to review or disclosure, except as provided in this section, or discovery or introduction into evidence*." RCW 70.41.200(3) (emphasis added). By using multiple words prohibiting different types of access, the legislature emphasized that this information is not subject to external access *in any form* unless a specific exemption enumerated in RCW 70.41.200 applies. *See also* FINAL B. REP. on Engrossed H.B. 2254 (July 24, 2005) ("The review or disclosure of information and documents specifically created for, and collected and maintained by, quality improvement and peer review committees or boards *is prohibited unless there is a specific exemption*." (emphasis added)). None of the RCW 70.41.200 exemptions apply here.

¶40 The majority purports to "narrowly construe" the statute but actually reads the language chosen by our legislature out of the statute. Majority at 772. The statute's prohibition of "disclosure" plainly bars Lowy's discovery request. "[D]isclosure" is defined as "the act or an instance of opening up to view, knowledge, or comprehension." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 645 (2002). By demanding that PeaceHealth cull its privileged database to

produce records identified therein, the hospital is forced to open up the database in the form of providing the plaintiff with knowledge of some of its contents.

¶41 The attempt to draw a distinction between "internal" and "external" review of privileged records misses the point. It would be illogical for the hospital to suggest it could not review quality improvement materials for its own purposes—that is the reason the records exist. The problem is that in this case, Lowy seeks to compel the hospital to review its privileged records for her purposes. In this scenario, the hospital's internal review is actually a proxy for external access to the protected database. The statute does not allow a medical malpractice plaintiff to co-opt a hospital representative to access the hospital's quality review records.

¶42 Lowy claims to seek only unprivileged information, but inevitably some privileged information will be disclosed to her by fulfilling her request. PeaceHealth's "Cubes" database is derived from incident reports, which are privileged quality assurance documents. No original source documents are incorporated into the database. In other words, there is nothing within the database that was created for a purpose other than quality review. Accordingly, identifying patient files based upon an internal review of the Cubes database would reveal the cases that were routed to and considered by the quality improvement committee. Although the majority and the Court of Appeals tried to list what will *not* be disclosed, the plain language of RCW 70.41.200(3) does not permit *any* disclosure absent an exception.

*THE STATUTORY PURPOSE OF RCW 70.41.200(3)*

¶43 We have held the applicability of a quality review statute is to be determined by deciding whether disclosure would interfere with the statutory purpose. *Coburn v. Seda*, 101 Wn.2d 270, 278, 677 P.2d 173 (1984). The purpose of

RCW 70.41.200 is to improve the quality of patient care by fostering peer review and encouraging the open reporting of incidents. Records created and maintained for quality review purposes are privileged because the legislature recognized that external access to this information "stifles candor and inhibits the constructive criticism thought necessary to effective quality review." *Anderson*, 103 Wn.2d at 905.

¶44 The threat of disclosure promised by the majority decision is bound to deter the filing of incident reports, which will diminish the effectiveness of the internal review mechanism. "[T]he decision by hospital staff members to submit a medical incident report is a key part of the [quality improvement] process." Amicus Curiae Br. of Washington State Hospital Association et al. at 7. " 'Constructive professional criticism cannot occur in an atmosphere of apprehension that one doctor's suggestion will be used as a denunciation of a colleague's conduct in a malpractice suit.' " *Coburn*, 101 Wn.2d at 275 (quoting *Bredice v. Doctors Hosp., Inc.*, 50 F.R.D. 249, 250 (D.D.C. 1970), *aff'd*, 156 U.S. App. D.C. 199, 479 F.2d 920 (1973)).

¶45 Hospital staff members will surely think twice before filing an incident report if the existence of the report will be revealed in a malpractice action against a co-worker or employer. The prospect of civil discovery inhibiting the candor of medical staff was deemed unacceptable by the legislature. This is why the privilege for quality review materials "embraces [the] goal of medical staff candor in apprising their peers to improve the quality of in-hospital medical practice at the costs of impairing malpractice plaintiffs access to evidence." *Anderson*, 103 Wn.2d at 905.

¶46 It is true that RCW 70.41.200(3) may not be used as "a shield to obstruct access to records outside the scope of the privilege." Majority at 788. But, the majority would instead have Lowy use the hospital database as a sword, punishing the hospital for its own quality improvement efforts. Perversely, the more thorough the database and the

better its electronic search capabilities, the more useful it will be for Lowy's purposes. This undermines one of the reasons such records are privileged: to "prevent[ ] the opposing party from taking advantage of a hospital's careful self-assessment." *Coburn*, 101 Wn.2d at 274.

¶47 In fact, the instinctive notion that a party's work should not be turned against it is the only manner in which we have compared RCW 70.41.200(3) to attorney work product privilege. *Id.* The majority attempts to make a broader analogy between the two privileges because the attorney work product privilege is not absolute: work product may be obtained if the opposing party has no other means of obtaining the information without undue hardship. The majority admits that "unlike the work product doctrine, the peer review statute at issue does not specifically list any exception to the protection from discovery." Majority at 787. Still, the majority attempts to read a similar undue hardship exception into RCW 70.41.200(3). The essence of the majority's analysis is that the privileged Cubes database should be used to provide Lowy information to use in her malpractice action because she cannot find it elsewhere. RCW 70.41.200(3) does not permit this. Moreover, the statute at issue *does* list exceptions; only none of them apply here.

¶48 The public interest in candid hospital review procedures to improve health care should prevail over a plaintiff's demand for information from the most convenient source. I would recognize that this legislation, RCW 70.41-.200(3), prohibits a plaintiff from forcing a hospital to use its privileged quality review materials to reveal cases of confidential incident reports. Because the production of patient files located through reference to a quality review database will necessarily reveal the contents of the database itself, I respectfully dissent.