# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| MEGHAN A. McSORLEY, | No. 86325-8-I |
| Respondent, | DIVISION ONE |
| v. | PUBLISHED OPINION |
| THE EVERETT CLINIC, a Washington professional limited liability company; NARIMAN HESHMATI, an individual; and ALBERT FISK, an individual, | |
| Petitioners, | |
| OPTUM CARE SERVICES COMPANY, a Minnesota corporation, f/d/b/a DaVITA MEDICAL GROUP; OPTUM CARE, INC., a Minnesota corporation, f/d/b/a DaVITA MEDICAL GROUP, | |
| Defendants. | |

BIRK, J. — The Everett Clinic (TEC) seeks discretionary review of a discovery order compelling it to disclose privileged material subject to the peer review and quality improvement privileges. Dr. Meghan McSorley brought a Washington Law Against Discrimination (WLAD), ch. 49.60 RCW, disparate treatment claim against TEC, her former employer. During discovery, TEC was granted a protective order as to its privileged peer review and quality improvement files, which it later partially waived, disclosing only Dr. McSorley's file. Dr. McSorley sought an order compelling disclosure of other privileged peer review

and quality improvement files, specifically for alleged WLAD comparator Dr. Nariman Heshmati. Because Dr. Heshmati's peer review and quality improvement file was part of the same subject matter as Dr. McSorley's, fairness required the disclosure of Dr. Heshmati's file. We affirm.

I

In June 2021, Dr. McSorley filed a complaint against, among others, TEC and its partner and obstetrics and gynecology (OB/GYN) specialist, Dr. Heshmati, alleging violations of WLAD and wrongful termination in violation of public policy. Dr. McSorley, an employee of TEC from 2016 to 2019, claimed Dr. Heshmati was regularly disrespectful to her, undermined her, and investigated and criticized her behind her back—behavior he did not direct towards male doctors. Dr. McSorley raised concerns about Dr. Heshmati's practice and "systemic quality control deficiencies that had led to bad patient outcomes." Dr. McSorley alleged these concerns were not properly investigated by TEC.

Dr. McSorley claimed Dr. Heshmati used the peer review and quality assurance systems at TEC to lodge meritless complaints against her. Dr. McSorley alleges she submitted a letter to the head of the Quality Review Committee for TEC, where she raised concerns over Dr. Heshmati's management of patient care. In response, Dr. McSorley claims she had an off the record meeting with Dr. Albert Fisk, the Chief Medical Officer at TEC, in which she was asked to voluntarily relinquish her hospital privileges by end of day. After protesting the request by e-mail, which she refers to as "a formal complaint of gender discrimination and retaliation, including whistleblower retaliation," Dr.

McSorley alleges that "[l]ess than one hour later, Dr. Fisk removed [her] ability to practice medicine at the Clinic entirely."

Dr. McSorley asserts that after she passed a "demeaning" and "remedial" assessment that TEC required, TEC delayed reinstating her, and when Dr. Fisk finally did begin the reinstatement process, he refused to apologize, compensate her for lost performance bonuses, or assist her in reestablishing her practice. Due to her continuing fear of gender-based discrimination, Dr. McSorley chose not to practice medicine at TEC again.

During discovery, Dr. McSorley sought documents related to TEC's response to complaints raised against her and other similarly situated male OB/GYN comparators. In February 2022, Dr. McSorley moved to compel TEC to produce all documents identified in its privilege logs, not generated, created, and maintained exclusively by the peer review committee. In July 2022, after conducting an in camera review, the superior court ordered the petitioners to produce numerous documents identified in the privilege log, while not ordering disclosure of others. The order conformed the privilege narrowly to those documents created exclusively for review committees.[1]

Then in 2023, TEC waived peer review and quality improvement privileges for "any and all files, facts, and testimony regarding" Dr. McSorley's peer review, and produced those documents. TEC provided little explanation for its reversal in strategy, stating, "In order to provide context to the documents that [the superior

---

[1] See Lowy v. Peacehealth, 174 Wn.2d 769, 778, 280 P.3d 1078 (2012) (strictly construing peer review and quality improvement privileges).

court] ordered to be produced, on June 16, 2023, TEC produced the rest of the documents related to [Dr. McSorley's] peer review file."[2] Dr. McSorley moved to compel production of Dr. Heshmati's peer review file, asserting that TEC had waived privilege by partially and selectively disclosing Dr. McSorley's peer review file and that in fairness, TEC should be ordered to produce at least Dr. Heshmati's peer review file as well, arguing he was a proper comparator for purposes of her discrimination claim. Dr. McSorley also suggested she would seek similar documents for other comparators.

The superior court granted Dr. McSorley's motion to compel. The superior court ruled that the test for implied waiver had been satisfied, that, for purposes of discovery, Dr. Heshmati was a proper comparator, and that in fairness his peer review file had to be produced. The superior court certified its order for discretionary review under RAP 2.3(b)(4). A commissioner of this court granted discretionary review under that rule. TEC maintains that its waiver of the peer review and quality improvement privileges is limited to Dr. McSorley's peer review file it disclosed, and that the superior court erred by compelling further disclosure.

II

The superior court ruled that TEC made an intentional[3] and selective disclosure of privileged information and it was appropriate to compel production of

---

[2] One document disclosed was a case review summary in which a reviewer assessing Dr. McSorley denoted a concern with the standard of care, issues with quality, and the opinion that Dr. McSorley's ministrations "[p]robably did contribute to harm" in the reviewed case. Other documents disclosed included e-mails in which Dr. McSorley's care for two patients was critiqued.

[3] We are concerned in this case with *intentional* disclosure of privileged information. We analyzed *inadvertent* disclosure in Sitterson v. Evergreen Sch.

4

other privileged documents necessary to fairly adjudicate Dr. McSorley's disparate treatment claims. We agree. The general rule, codified in ER 502(a) for the attorney-client privilege and the work product doctrine, is that when a party makes a partial disclosure of privileged documents, it waives privilege also for documents relating to the same subject matter and that ought in fairness to be considered together. Whether a waiver of privilege was made is reviewed de novo.[4] Magney v. Truc Pham, 195 Wn.2d 795, 801, 466 P.3d 1077 (2020).

A

The Washington Supreme Court considered the effect of a partial disclosure of privileged material in McUne v. Fuqua, where a litigant claiming personal injury from an automobile collision presented at trial his own testimony and that of three doctors about his physical ailments and disabilities. 42 Wn.2d 65, 68, 74-76, 253 P.2d 632 (1953). The opposing party sought to introduce the testimony of other doctors who would testify that the plaintiff had similar complaints predating the collision. Id. at 73. The court held the plaintiff's testimony at trial was a waiver, but limited to testimony regarding "the same ailments and disabilities." Id. at 76. McUne asks whether there is "*such relation* between the old and new medical

---

Dist. No. 114, 147 Wn. App. 576, 584-88, 196 P.3d 735 (2008), and adopted a five-part test to assess waiver on an inadvertent basis.

[4] Case law leaves open the possibility that a trial court's determination of the extent to which fairness requires further disclosure is a discretionary decision, reviewed for abuse of discretion. Magney, 195 Wn.2d at 799 ("[W]e conclude that the discretion of whether a privilege has been impliedly waived belongs to the trial court judge, who has access to the entirety of the record of the case and who can determine whether any disclosures thus far impliedly waived the privilege."). Because we affirm based on a de novo review, we do not consider whether the abuse of discretion standard governs review of the extent of a given waiver.

testimony that appellant's production of the former constituted a waiver of the privilege as to the latter."[5]  Id. at 77 (emphasis added).

McUne applied the rule of subject matter waiver.  Under this rule,

When a party reveals part of a privileged communication in order to gain an advantage in litigation, it waives the privilege as to all other communications relating to the same subject matter because "the privilege of secret consultation is intended only as an incidental means of defense and not as an independent means of attack, and to use it in the latter character is to abandon it in the former."

In re Sealed Case, 676 F.2d 793, 818 (D.C. Cir. 1982) (quoting 8 J. WIGMORE, EVIDENCE IN TRIALS AT COMMON LAW § 2327, at 638 (J. McNaughton rev. 1961)).  Selective disclosure of privileged material risks conveying an incomplete or even misleading picture to the trier of fact, because the privilege holder might unfairly disclose parts of privileged material that seem to support its position, while withholding context or other material undercutting its position.  2 EDWARD J. IMWINKELREID, THE NEW WIGMORE: A TREATISE ON EVIDENCE § 6.12.7, at 1114-15 (2d ed. 2010).

---

[5] Like McUne, our case involves waiver through partial disclosure.  A different type of waiver occurs when a party asserts a contention in litigation that puts privileged information at issue.  See Pappas v. Holloway, 114 Wn.2d 198, 203, 207, 787 P.2d 30 (1990) (counterclaiming for legal malpractice); Steel v. Phila. Indem. Ins. Co., 195 Wn. App. 811, 816, 832, 381 P.3d 111 (2016) (seeking a reasonableness determination of a covenant judgment settlement); cf. Chevron Corp v. Pennzoil Co., 974 F.2d 1156, 1162 (9th Cir. 1992) (raising an affirmative defense) ("Where a party raises a claim which in fairness requires disclosure of the protected communication, the privilege may be implicitly waived.").  In those situations, Washington applies its version of "the Hearn test," Steel, 195 Wn. App. at 832, a framework derived from Hearn v. Rhay, 68 F.R.D. 574 (E.D. Wash. 1975).  At the parties' urging, the superior court used the Hearn framework to analyze and determine the extent to which fairness required further disclosure by TEC.  Although the two kinds of waiver are analytically distinct, the superior court's thorough order covered the points relevant to the analysis of TEC's waiver through partial disclosure.

6

The modern trend has been to limit subject matter waiver to additional material on the same subject that fairness requires to be disclosed "to avoid prejudice to the adversary party and 'distortion of the judicial process' that may result from selective disclosure." In re Actos Antitrust Litig., 628 F. Supp. 3d 524, 533 (S.D.N.Y. 2022) (quoting In re von Bulow, 828 F.2d 94, 101 (2d Cir. 1987)). A version of subject matter waiver has been adopted by rule for the attorney-client privilege and the work product doctrine in Washington proceedings under ER 502, patterned after Federal Rules of Evidence 502. Under this rule, subject matter waiver going beyond the information actually disclosed is "reserved for those unusual situations in which fairness requires a further disclosure of related, protected information, in order to prevent a selective and misleading presentation of evidence to the disadvantage of the adversary." FED. R. EVID. 502 advisory committee note.

Finally, in determining whether a party has waived privilege, courts may consider the purpose the privilege is meant to serve. Carson v. Fine, 123 Wn.2d 206, 214, 867 P.2d 610 (1994) (analyzing the scope of waiver: "Waiver occurs because the purpose of the privilege no longer exists."); Pappas v. Holloway, 114 Wn.2d 198, 208, 787 P.2d 30 (1990) (characterizing waiver analysis in part as limiting the attorney-client privilege to "the purpose for which it exists."); cf. Steel v. Phila. Indem. Ins. Co., 195 Wn. App. 811, 825, 381 P.3d 111 (2016) (requiring case-by-case justification for application of implied waiver test). When a party's use of a privilege fits with the intended purpose of a privilege, a finding of waiver is less likely. In contrast, when a party's use of a privilege is not consistent with

7

the purpose the privilege serves, then both a finding of waiver and a finding of a greater extent of waiver are more likely. In such a case, the party's actions indicate that it is not concerned with protecting the interests that were meant to be protected by the privilege. Cf. Sealed Case, 676 F.2d at 818 (courts need not allow a claim of privilege "when the party claiming the privilege seeks to use it in a way that is not consistent with the purpose of the privilege.").

B

TEC acknowledges that subject matter waiver is the appropriate analysis, but argues that the "subject matter" of its disclosure is limited to Dr. McSorley's peer review file, which it has already disclosed. It argues that the peer review files of any other physician would be a different subject matter. We disagree.

The superior court appropriately defined the subject matter of TEC's disclosure not in an arbitrary, abstract sense, but in the context of the issues being litigated. Decisions analyzing subject matter waiver are illustrative. In Actos, where the privilege holder had described two patents as ones that " 'claim' " a brand name drug for purpose of competition from generic drugs, it asserted a defense requiring it to show that it, in good faith, relied on advice that the descriptions were required by regulation. 628 F. Supp. 3d at 531, 534. The privilege holder waived privilege as to documents relating to the *applicability of* and its *compliance with* certain regulations. Id. at 536. The court found the proposed scope of the waiver might result in the privilege holder selectively withholding documents rebutting its good faith conclusion that its descriptions were *required* by the regulations. Id. Thus a subject matter broader than the disclosure itself

8

was implicated. Id. And where a party maintained its tax position was reasonable "because it was based on advice of counsel," the party put at issue "the tax advice it received." Chevron Corp v. Pennzoil Co., 974 F.2d 1156, 1162-63 (9th Cir. 1992). Withholding material informing "the extent" of the party's knowledge would "deny [the plaintiff] access to the very information that [it] must refute in order to demonstrate" the defendant's misconduct. Id. In contrast, in Weil v. Investment/Indicators, Research & Management, Inc., a privilege waiver made early in litigation, that was limited in scope and not prejudicial to the opposing party, did not compel further disclosure. 647 F.2d 18, 25 (9th Cir. 1981).

TEC's position is that it can use Dr. McSorley's peer review file to support its "good faith, reasonable basis" for conducting a peer review of Dr. McSorley. If a plaintiff makes a prima facie showing of discrimination, then the burden shifts to the defendant to " 'articulate a legitimate, nondiscriminatory reason for the adverse employment action,' " and if the defendant meets that burden the plaintiff must produce evidence showing the plaintiff's reasons were pretextual. Mikkelsen v. Pub. Util. Dist. No. 1 of Kittitas County, 189 Wn.2d 516, 527, 404 P.3d 464 (2017) (quoting Scrivener v. Clark Coll., 181 Wn.2d 439, 446, 334 P.3d 541 (2014)). TEC's interest in using Dr. McSorley's peer review file is in articulating a "legitimate, nondiscriminatory reason" for its actions towards her. Id. If TEC was given similar reasons to take action against male comparators but took none, it would support the inference that a substantial factor in its actions towards Dr. McSorley was her gender. Scrivener, 181 Wn.2d at 446-47 ("An employee may satisfy the pretext prong by offering sufficient evidence . . . (1) that the defendant's

9

reason is pretextual or (2) that although the employer's stated reason is legitimate, discrimination nevertheless was a substantial factor motivating the employer."). The superior court appropriately found that the relevance of the material to the action defined the subject matter for purposes of waiver: the disclosed documents allowed petitioners to "attack the quality" of Dr. McSorley's medical care "and *proffer an alternative explanation for the adverse actions against her* as a defense." (Emphasis added.) In the context of the litigation, the subject matter of TEC's disclosure of privileged material is appropriately defined as the justification for the actions taken against Dr. McSorley.

The superior court also appropriately determined that compelling a similar disclosure for male comparators was the fair requirement—and the fair limit—for additional disclosure. In some instances, the fairness standard might mean little or nothing additional needs to be disclosed after a waiver. See e.g., Weil, 647 F.2d at 25. Here, under longstanding principles governing employment discrimination cases, courts assess an employer's justification not just from what the employer claims, but from circumstantial evidence of its treatment of comparators. Mikkelsen, 189 Wn.2d at 526 (direct evidence of discrimination is rare, which is why "plaintiffs may rely on circumstantial, indirect, and inferential evidence to establish discriminatory action."). As the superior court explained, TEC's disclosure gave it an advantage "by allowing negative comments about Dr. McSorley to be discovered and discussed, without allowing analogous negative comments about Dr. Heshmati to be discovered and discussed." In a disparate

treatment claim, disclosure of the former without disclosure of the latter would amount to a selective and potentially misleading portrayal of the facts.

Thus far, the superior court has ruled only that Dr. Heshmati is a proper comparator for whom documents equivalent to those disclosed about Dr. McSorley must be produced. Contrary to TEC's fear, this does not give Dr. McSorley the unilateral ability to define the scope of discovery. The superior court's ruling logically limits further disclosure to equivalent peer review documents as to other doctors whom the court views as proper comparators. TEC does not precisely challenge the superior court's view that Dr. Heshmati is a proper comparator *for purposes of discovery.* And the record provides ample justification for the superior court's well-reasoned ruling in light of its broad discretion to determine the scope of discovery. Nakata v. Blue Bird, Inc., 146 Wn. App. 267, 277, 191 P.3d 900 (2008) ("A trial court has broad discretion under CR 26 to manage the discovery process."). With Dr. McSorley having so far identified one, or perhaps two, comparators after years of discovery, we see little risk that the superior court's ruling threatens an unfairly expansive definition of comparators for purposes of waiver. The superior court imposed a fair, reasonable, and clear limit on the extent of the privilege waiver.

Finally, both the conclusion of waiver here and its extent are appropriate in light of the purposes of the peer review and quality improvement privileges. See Carson, 123 Wn.2d at 214. "The general purpose of the peer review statute is to encourage health care providers to candidly review the work and behavior of their colleagues to improve health care." Lowy v. Peacehealth, 174 Wn.2d 769, 774,

11

280 P.3d 1078 (2012). TEC's disclosure to serve its strategic interests in an employment discrimination lawsuit with a former employee only undermines these purposes. For the purpose of a privilege to be served, "the participants in the confidential conversation 'must be able to predict with some degree of certainty whether particular discussions will be protected. An uncertain privilege, or one which purports to be certain but results in widely varying applications by the courts, is little better than no privilege at all.' " Jaffee v. Redmond, 518 U.S 1, 18, 116 S. Ct. 1923, 135 L. Ed .2d 337 (1996) (quoting Upjohn Co. v. United States, 449 U.S. 383, 393, 101 S. Ct. 677, 66 L. Ed. 2d 584 (1981)). TEC's disclosure has the same discouraging effect, as it signals to its provider employees the possibility that it may use their disclosures against their interests, should doing so be perceived to serve TEC's interests. When it disclosed Dr. McSorley's peer review file to aid its private interests in an employment discrimination lawsuit, TEC put aside the public's interest in encouraging providers—such as Dr. McSorley—to candidly report. The court is not obligated to protect a privilege more assiduously than its holder does.

Affirmed.

_____
Birk, J.

WE CONCUR:

_____        _____
Feldman, J.