

**FILE**
IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON
DATE OCT 20 2016

Madsen, C.J.
CHIEF JUSTICE

This opinion was filed for record

at 8:00 am on Oct 20, 2016

Susan L. Carlson
SUSAN L. CARLSON
SUPREME COURT CLERK

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | |
|---|---|
| MATTHEW A. NEWMAN, RANDY NEWMAN and MARLA NEWMAN, | NO. 90194-5 |
| Respondents, | |
| v. | EN BANC |
| HIGHLAND SCHOOL DISTRICT NO. 203, | Filed OCT 20 2016 |
| Petitioner. | |

STEPHENS, J.—Highland High School quarterback Matthew Newman suffered a permanent brain injury at a football game in 2009, one day after he allegedly sustained a head injury at football practice. Three years later, Newman and his parents (collectively Newman) sued Highland School District No. 203 (Highland) for negligence. Before trial, Highland's counsel interviewed several former coaches and appeared on their behalf at their depositions. Newman moved to disqualify Highland's counsel, asserting a conflict of interest. The superior court denied the motion but ruled that Highland's counsel "may not represent non-

employee witness[es] in the future." Clerk's Papers (CP) at 636. Newman then sought discovery concerning communications between Highland and the former coaches during time periods when the former coaches were unrepresented by Highland's counsel. Highland responded with a motion for a protective order, arguing its attorney-client privilege shielded counsel's communications with the former coaches. The trial court denied the motion, and Highland appealed.

At issue is whether postemployment communications between former employees and corporate counsel should be treated the same as communications with current employees for purposes of applying the corporate attorney-client privilege. Although we follow a flexible approach to application of the attorney-client privilege in the corporate context, we hold that the privilege does not broadly shield counsel's postemployment communications with former employees. The superior court properly denied Highland's motion for a protective order. We affirm the lower court and lift the temporary stay of discovery.

## FACTS AND PROCEDURAL HISTORY

Matthew Newman suffered a permanent brain injury during a football game on September 18, 2009. Newman sued Highland for negligence in violation of the Lystedt law, RCW 28A.600.190, which requires the removal of a student athlete from competition or practice if he or she is suspected of having a concussion. Newman alleges that Matthew suffered a head injury at football practice the day before the September 18 game, and that Highland coaches permitted him to play in the game even though he exhibited symptoms of a concussion.

In preparing for trial, Newman's counsel deposed the entire football coaching staff employed at the time of Newman's injury, including coaches who were no longer employed by Highland. At the depositions, Highland's counsel indicated that he had interviewed the former coaches before their individual depositions, and was appearing on their behalf for purposes of their depositions.

Newman moved to disqualify Highland's counsel from representing the former coaches, claiming a conflict of interest under Rule of Professional Conduct (RPC) 1.7. The superior court denied the motion but ruled that Highland's counsel "may not represent non-employee witness[es] in the future." CP at 636.

Newman then sought discovery concerning communications between Highland's counsel and its former coaches. Highland moved for a protective order to shield those communications, asserting attorney-client privilege. The superior court denied the protective order and directed Highland to respond to Newman's discovery requests. The superior court ordered Highland's counsel to disclose "exactly when defense counsel represented each former employee," and barred defense counsel from asserting the attorney-client privilege with respect to communications outside the deposition representation. CP at 70.[1]

---

[1] Newman did not appeal the trial court's order denying disqualification of Highland's counsel from representing the former coaches at their depositions, and does not challenge the assertion of attorney-client privilege during this period. Nor do the parties dispute that communications with counsel during the coaches' employment are protected by the attorney-client privilege. This notion of a "durable privilege" is well recognized and does not appear to be at issue here because the relevant communications occurred after the coaches left Highland's employment. *See In re Coordinated Pretrial Proceedings in Petrol. Prods. Litig.,* 658 F.2d 1355, 1361 n.7 (9th Cir. 1981) (recognizing that attorney-client privileged conversations "remain privileged after the employee leaves"); *see also*

Highland sought discretionary review of the superior court's discovery order, which the Court of Appeals denied. This court subsequently granted discretionary review and entered a temporary stay of discovery. *Newman v. Highland Sch. Dist. No. 203*, 180 Wn.2d 1031, 332 P.3d 985 (2014).

## ANALYSIS

### 1. The Corporate Attorney-Client Privilege Does Not Shield Communications between Corporate Counsel and Former Employees

Whether the attorney-client privilege extends to postemployment communications between corporate counsel and former employees is an issue of first impression in Washington. The leading United States Supreme Court case addressing corporate attorney-client privilege, *Upjohn Co. v. United States*, expressly did not answer this question. 449 U.S. 383, 394 n.3, 101 S. Ct. 677, 66 L. Ed. 2d 584 (1981). Highland argues the flexible approach to protecting privileged communications recognized in *Upjohn* supports extending the privilege to postemployment communications with former employees. Am. Pet'r's Br. at 23. We disagree. Because we conclude *Upjohn* does not justify applying the attorney-client privilege outside the employer-employee relationship, the trial court properly denied Highland a protective order to shield from discovery communications with

---

*Peralta v. Cendant Corp.*, 190 F.R.D. 38, 41 (D. Conn. 1999) (concluding any privileged information obtained during employment remains privileged upon termination of employment).

former coaches who are otherwise fact witnesses in this litigation. We affirm the trial court's decision to deny Highland's motion for protective order, and lift the temporary stay of discovery.

We begin by recognizing that, in our open civil justice system, parties may obtain discovery regarding any unprivileged matter that is relevant to the subject matter of the pending action. CR 26(b)(1). "'[T]he privilege remains an exception to the general duty to disclose.'" *Peralta v. Cendant Corp.*, 190 F.R.D. 38, 41 (D. Conn. 1999) (alteration in original) (quoting 8 JOHN HENRY WIGMORE, EVIDENCE IN TRIALS AT COMMON LAW 554 (McNaughton rev. ed. 1961)). A party claiming that otherwise discoverable information is exempt from discovery on grounds of the attorney-client privilege carries the burden of establishing entitlement to the privilege. *See Dietz v. John Doe*, 131 Wn.2d 835, 844, 935 P.2d 611 (1997).

Washington's attorney-client privilege provides that "[a]n attorney or counselor shall not, without the consent of his or her client, be examined as to any communication made by the client to him or her, or his or her advice given thereon in the course of professional employment." RCW 5.60.060(2)(a). But the attorney-client privilege does not automatically shield any conversation with any attorney. *See, e.g., Morgan v. City of Federal Way*, 166 Wn.2d 747, 755-56, 213 P.3d 596 (2009). To qualify for the privilege, communications must have been made in

confidence and in the context of an attorney-client relationship. *See id.* at 755-57. It is "a narrow privilege and protects only 'communications and advice between attorney and client.'" *Hangartner v. City of Seattle*, 151 Wn.2d 439, 452, 90 P.3d 26 (2004) (quoting *Kammerer v. W. Gear Corp.*, 96 Wn.2d 416, 421, 635 P.2d 708 (1981)). The privilege extends to corporate clients and may encompass some communications with lower level employees, as both the United States Supreme Court and this court have recognized. *Upjohn*, 449 U.S. at 396; *Wright v. Grp. Health Hosp.*, 103 Wn.2d 192, 195-96, 691 P.2d 564 (1984); *Youngs v. PeaceHealth*, 179 Wn.2d 645, 650-51, 316 P.3d 1035 (2014).

The attorney-client privilege does not shield facts from discovery, even if transmitted in communications between attorney and client. *Youngs*, 179 Wn.2d at 653 ("Facts are proper subjects of investigation and discovery, even if they are also the subject of privileged communications."). Rather, only privileged communications themselves are protected in order "to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." *Upjohn*, 449 U.S. at 389. The attorney-client privilege "recognizes that sound legal advice or advocacy serves public ends and that such advice or advocacy depends upon the lawyer being fully informed by the client." *Id.* However, because "the privilege

sometimes results in the exclusion of evidence which is otherwise relevant and material, contrary to the philosophy that justice can be achieved only with the fullest disclosure of the facts, the privilege cannot be treated as absolute; rather, it must be strictly limited to the purpose for which it exists." *Pappas v. Holloway*, 114 Wn.2d 198, 203-04, 787 P.2d 30 (1990) (citing *Dike v. Dike*, 75 Wn.2d 1, 11, 448 P.2d 490 (1968)).

In enunciating a flexible test for determining the scope of the attorney-client privilege in the corporate setting, *Upjohn* expanded the definition of "client" to sometimes include nonmanagerial employees. 449 U.S. at 394-95; *see also Youngs*, 179 Wn.2d at 661. The *Upjohn* Court considered several factors, including whether the communications at issue (1) were made at the direction of corporate superiors, (2) were made by corporate employees, (3) were made to corporate counsel acting as such, (4) concerned matters within the scope of the employee's duties, (5) revealed factual information "'not available from upper-echelon management,'" (6) revealed factual information necessary "'to supply a basis for legal advice,'" and whether the communicating employee was sufficiently aware that (7) he was being interviewed for legal purposes, and (8) the information would be kept confidential. *Youngs*, 179 Wn.2d at 664 n.7 (quoting *Upjohn*, 449 U.S. at 394).

In denying Highland's motion for a protective order, the superior court incorrectly stated that this court has never adopted *Upjohn*. In both *Wright* and *Youngs*, this court embraced *Upjohn*'s flexible approach to applying the attorney-client privilege in the corporate client context. *Wright*, 103 Wn.2d at 195-96; *Youngs*, 179 Wn.2d at 645. However, until today we have never considered whether *Upjohn* supports expanding the scope of the privilege to include counsel's communications with *former* nonmanagerial employees. In *Youngs*, this court relied on *Upjohn* to recognize that corporate litigants have the right to engage in confidential fact-finding and to communicate directions to employees whose conduct may embroil the corporation in disputes. *Youngs*, 179 Wn.2d at 651-52. The court in *Youngs* relied on the values underlying the attorney-client privilege to create an exception to the general prohibition on defense counsel's ex-parte contact with the plaintiff's treating physician, applicable when the physician is employed by the defendant. *Id.* at 662 (creating exception based on attorney-client privilege to rule established in *Loudon v. Mhyre*, 110 Wn.2d 675, 756 P.2d 138 (1988)). But *Youngs* did not answer whether the attorney-client privilege should extend beyond termination of the employment relationship.

Today, we reject Highland's argument that *Upjohn* and *Youngs* support a further extension of the corporate attorney-client privilege to postemployment

communications with former employees. The flexible approach articulated in *Upjohn* presupposed attorney-client communications taking place within the corporate employment relationship. *Upjohn*, 449 U.S. at 389 (the purpose of the attorney-client privilege is "to encourage full and frank communication between attorneys and their clients"); *see also Youngs*, 179 Wn.2d at 661 (noting corporate employees may sometimes be corporate clients). We decline to expand the privilege to communications outside the employer-employee relationship because former employees categorically differ from current employees with respect to the concerns identified in *Upjohn* and *Youngs*.

A school district, like any organization, can act only through its constituents and agents. *See* RPC 1.13 cmt. 1. Corporate attorney-client privilege may arise when "the constituents of an organizational client communicate[] with the organization's lawyer in that person's organizational capacity." *Id.* at cmt. 2; *see also* RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 73(2) (AM. LAW INST. 2000). An organizational client, including a governmental agency, can require its own employees to disclose facts material to their duties (with some limits not relevant here) to its counsel for investigatory or litigation purposes. *See* RESTATEMENT (THIRD) OF AGENCY § 8.11 (AM. LAW INST. 2006).

But everything changes when employment ends. When the employer-employee relationship terminates, this generally terminates the agency relationship.[2] As a result, the former employee can no longer bind the corporation and no longer owes duties of loyalty, obedience, and confidentiality to the corporation. *See id.* & cmt. d. Without an ongoing obligation between the former employee and employer that gives rise to a principal-agent relationship, a former employee is no different from other third-party fact witnesses to a lawsuit, who may be freely interviewed by either party. *See Infosystems, Inc. v. Ceridian Corp.,* 197 F.R.D. 303, 305 (E.D. Mich. 2000) ("'It is virtually impossible to distinguish the position of a former employee from any other third party who might have pertinent information about one or more corporate parties to a lawsuit.'" (quoting *Clark Equip. Co. v. Lift Parts Mfg. Co.,* 1985 WL 2917, at *5 (N.D. Ill. Oct. 1, 1985) (court order))).

Highland's argument for extending the attorney-client privilege to its communications with the former coaches emphasizes that these former employees

---

[2] Some courts have recognized that the attorney-client privilege could extend to former employees in those situations in which a continuing agency duty exists. *See Peralta,* 190 F.R.D. at 41 n.1 (stating "[a]ccording to the Restatement (Third) of the Law Governing Lawyers, [§ 73 cmt. e,] the attorney-client privilege would not normally attach to communications between former employees and counsel for the former employer" in the absence of "a continuing duty to the corporation" based on agency principles); *Infosystems, Inc. v. Ceridian Corp.,* 197 F.R.D. 303, 306 (E.D. Mich. 2000) (recognizing "there may be situations where the former employee retains a present connection or agency relationship with the client corporation" that would justify application of the privilege).

may possess vital information about matters in litigation, and that their conduct while employed may expose the corporation to vicarious liability. These concerns are not unimportant, but they do not justify expanding the attorney-client privilege beyond its purpose. The underlying purpose of the corporate attorney-client privilege is to foster full and frank communications between counsel and the client (i.e., the corporation), not its former employees. *State v. Chervenell*, 99 Wn.2d 309, 316, 662 P.2d 836 (1983). This purpose is preserved by limiting the scope of the privilege to the duration of the employer-employee relationship. *See* RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 73(2).[3] Upon termination of the employment relationship, the interests of employer and former employee may diverge. But the attorney-client privilege belongs solely to the corporation, and it may be waived or asserted solely by the corporation, even to the detriment of the employee.

---

[3] The *Restatement* recognizes that in general privileged communications are temporally limited to the duration of a principal-agent relationship:

> [A] person making a privileged communication to a lawyer for an organization must then be acting as agent of the principal-organization. The objective of the organizational privilege is to encourage the organization to have its agents communicate with its lawyer . . . [.] Generally, that premise implies that persons be agents of the organization at the time of communicating.

RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 73 cmt. e. The *Restatement* comment acknowledges the privilege may extend to postemployment communications in limited circumstances, based on the agency principles discussed in note 2 of this opinion. *Id.*

Refusing to extend the corporate attorney-client privilege articulated in *Upjohn* beyond the employer-employee relationship preserves a predictable legal framework. *Upjohn* recognized the value of predictability when determining the applicability of the attorney-client privilege:

> [I]f the purpose of the attorney-client privilege is to be served, the attorney and client must be able to predict with some degree of certainty whether particular discussions will be protected. An uncertain privilege, or one which purports to be certain but results in widely varying applications by the courts, is little better than no privilege at all.

449 U.S. at 393. We find this considerations particularly relevant here, where the question before us is at what point in the employer-employee relationship the attorney-client privilege ceases to attach. All agree that it cannot extend forever and that it cannot encompass every communication between corporate counsel and former employees. But it is difficult to find any principled line of demarcation that extends beyond the end of the employment relationship. We conclude that the interests served by the privilege are sufficiently protected by recognizing that communications between corporate counsel and employees during the period of employment continue to be privileged after the agency relationship ends. *See supra* note 1.

We recognized that some courts have extended the corporate attorney-client privilege to former employees because of the corporation's perceived need to know what its former employees know. *See In re Allen,* 106 F.3d 582, 605-06 (4th Cir.

1997) (collecting cases). We find this justification unpersuasive. A defendant might easily perceive itself as needing to know many things known by potential witnesses, and might strongly prefer not to share its conversations with those witnesses with the other side. So might a plaintiff. So might a government. That alone should not be enough to justify frustrating "the truthseeking mission of the legal process" by extending the old privilege. *United States v. Tedder*, 801 F.2d 1437, 1441 (4th Cir. 1986) (citing *United States v. (Under Seal)*, 748 F.2d 871, 875 (4th Cir. 1984)).

The superior court properly rejected Highland's argument that former employees should be treated the same as current employees. The court appropriately allowed Highland to assert its attorney-client privilege over communications with the former coaches only during the time Highland's counsel purportedly represented them at their depositions. We therefore affirm the superior court's decision to deny Highland's motion for a protective order and lift the temporary stay of discovery issued by our commissioner.

*2. Attorney Fees on Appeal*

We deny Newman's request for attorney fees on appeal. Newman requests fees under CR 26(c) and CR 37(a)(4) for successfully challenging Highland's claim of attorney-client privilege. Br. of Resp'ts at 33. We deny Newman's request because Highland's opposition to discovery was reasonable given that the question

of whether the corporate attorney-client privilege extends to former employees was a novel legal question of first impression in Washington. CR 37(a)(4) (mandatory award of expenses and attorney fees for successfully challenging a motion becomes discretionary if "the court finds that the opposition to the motion was substantially justified or that other circumstances make an award of expenses unjust"). For these same reasons, we also exercise our discretion to deny Newman's request for fees pursuant to chapter 7.21 RCW (2001).[4]

## CONCLUSION

We affirm and lift the temporary stay of discovery. The superior court properly denied Highland's motion for a protective order shielding from discovery its postemployment communications with former employees.

---

[4] This discretionary review does not include any issue concerning the trial court's order imposing contempt sanctions against Highland, or limit the trial court's ability to revisit that order in light of our decision. *See Washburn v. Beatt Equip. Co.,* 120 Wn.2d 246, 300, 840 P.2d 860 (1992) ("Absent a proper certification, an order which adjudicates fewer than all claims or the rights and liabilities of fewer than all parties is subject to revision at any time before entry of final judgment as to all claims and the rights and liabilities of all parties.").

Stephens, J.

WE CONCUR:

Johnson, J.

González, J.

Fairhurst, J.

Yu, J.

No. 90194-5

WIGGINS, J. (dissenting)—I agree with the majority that any communications that fall within the attorney-client privilege during employment remain protected by the privilege after employment is terminated. I also agree with the majority this court has adopted the reasoning of *Upjohn Co. v. United States*, 449 U.S. 383, 101 S. Ct. 677, 66 L. Ed. 2d 584 (1981). However, I disagree with the majority's decision to adopt a bright-line rule that will cut off the corporate attorney-client privilege at the termination of employment, and will exclude from its scope all postemployment communications with former employees, even when those employees have relevant personal knowledge regarding the subject matter of the legal inquiry and even though had they remained employed, such communications with counsel would have been privileged under *Upjohn*. This temporal limitation is at odds with the functional analysis underlying the decision in *Upjohn* and ignores the important purposes and goals that the attorney-client privilege serves.

Instead, I would conclude the scope of the attorney-client privilege and the decision as to whether to extend its protections to former employees is based on the flexible approach articulated in *Upjohn*. Under this flexible analysis, I would hold that postemployment communications consisting of a factual inquiry into the former employee's conduct and knowledge during his or her employment, made in furtherance of the corporation's legal services, are privileged. Accordingly, I respectfully dissent.

ANALYSIS

I.   The Majority's Position Is at Odds with *Upjohn's* Functional Analysis

As the majority correctly acknowledges, this court has embraced the flexible approach in *Upjohn* for determining the scope of the attorney-client privilege in the corporate context. Majority at 8; *see also Youngs v. PeaceHealth*, 179 Wn.2d 645, 653, 316 P.3d 1035 (2014). *Upjohn* is the leading case on the scope of corporate attorney-client privilege. In *Upjohn*, the Supreme Court was presented with the question of whether the attorney-client privilege in the corporate context could ever apply to communications between corporate counsel and lower-level corporate employees.

At the time the Supreme Court decided *Upjohn*, two competing tests had emerged in the lower courts regarding the scope of the corporate attorney-client privilege. *Upjohn*, 449 U.S. at 386. One such test, adopted by the lower court in *Upjohn*, was the "control group test," which would have limited the corporate attorney-client privilege to the "'control group'" of the corporation, namely "those officers, usually top management, who play a substantial role in deciding and directing the corporation's response to the legal advice given." *United States v. Upjohn Co.*, 600 F.2d 1223, 1224, 1226 (6th Cir. 1979), *rev'd*, 449 U.S. 383. The control group test was based on the rationale that only those individuals who acted like a traditional "client" would receive the protection of the privilege, and as the lower court in *Upjohn* stated, it adopted the control group because the corporate client was an inanimate entity and "only the senior management, guiding and integrating the several operations, . . . can be said to possess an identity analogous to the corporation as a whole." *Id.* at 1226.

2

On appeal, the Supreme Court unanimously rejected the narrow control group test. *Upjohn*, 449 U.S. at 390. Instead of looking to the identity of the individual corporate actors to see whether they possessed a sufficient identity of relationship to the corporation so as to qualify as a client—as the lower court had done—the Court looked to the nature of the communications to see whether the purposes underlying the attorney-client privilege would be furthered by its extension to the communications at issue. *Id.* at 391-92. The Supreme Court identified several purposes underlying the privilege, including that the privilege encourages full and frank communication between attorneys and their clients, and enables clients to take full advantage of the legal system. *Id.* at 389, 391. The privilege is based on a recognition "that sound legal advice or advocacy serves public ends and that such advice or advocacy depends upon the lawyer's being fully informed by the client." *Id.* at 389. The control group test was inadequate because it failed to recognize that the privilege "exists to protect not only the giving of professional advice to those who can act on it but also the giving of information to the lawyer to enable him to give sound and informed advice." *Id.* at 390.

The *Upjohn* Court declined to establish a bright-line rule regarding the scope of the attorney-client privilege in the corporate setting. *Id.* at 396-97. Instead, the Court provided a functional framework for analyzing the scope of the attorney-client privilege on a case-by-case basis. *Id.* This functional analysis focused on the communications at issue and the perceived purposes underlying the privilege. *Id.* at 394-95. "In large part, the Court's inquiry resolves into a single question: Would application of the privilege under the circumstances of this particular case foster the flow of information

3

to corporate counsel regarding issues about which corporations seek legal advice?" John E. Sexton, *A Post*-Upjohn *Consideration of the Corporate Attorney-Client Privilege*, 57 N.Y.U. L. REV. 443, 459 (1982).

In *Upjohn*, the Court found it relevant that the communications were made by corporate employees to corporate counsel at the direction of corporate superiors, and that the communications concerned factual information that fell within the scope of the employee's duties that was "'not available from upper-echelon management'" and that was necessary "'to supply a basis for legal advice.'" *Youngs*, 179 Wn.2d at 664 n.7 (quoting *Upjohn*, 449 U.S. at 394). The Court also noted that the communicating employee was aware that the interview was conducted for legal purposes and that the information would be kept confidential. *Id.* In light of these characteristics, the *Upjohn* Court held that these communications were privileged because doing so was consistent with the underlying purpose of the attorney-client privilege to allow for full and frank fact-finding. *Upjohn*, 449 U.S. at 395.

We previously praised the *Upjohn* Court's analysis and its focus on furthering the "laudable goals of the attorney-client privilege." *Wright v. Grp. Health Hosp.*, 103 Wn.2d 192, 202, 691 P.2d 564 (1984). In our recent decision in *Youngs*, we acknowledged in our discussion of the attorney-client privilege that *Upjohn* "defines the scope of the corporate attorney-client privilege," 179 Wn.2d at 651, and we expressly relied on *Upjohn*'s reasoning after observing that Washington courts had endorsed *Upjohn*'s "'flexible . . . test'" for more than 30 years, *id.* at 662 (alteration in original) (quoting *Wright*, 103 Wn.2d at 202).

4

The majority in this case now eschews *Upjohn*'s functional analysis for a bright-line rule, cutting off the privilege at the termination of employment. *See* majority at 12. The majority argues that *Upjohn* supports this bright-line rule because the Court presupposed that the communications occurred within the corporate employee relationship. *Id.* at 9. Nothing in the *Upjohn* decision supports the majority's bald assertion that the decision "presupposed attorney-client communications taking place within the corporate employment relationship" before the privilege would attach. *Id.* In fact, 7 of the 86 employees interviewed by corporate counsel in *Upjohn* had left employment prior to being interviewed. *Upjohn*, 449 U.S. at 394 n.3. The Court expressly declined to decide the issue whether former employees were included in the privilege, instead providing the functional framework for lower courts to utilize in answering that precise question.[1] *See id.*

Moreover, the majority's focus on the formalities of the relationship between the employee and the corporation as the standard for the attorney-client privilege misses the point of the *Upjohn* Court's functional framework. The *Upjohn* Court rejected the control group test, and the focus that test placed on the level of control and responsibilities of the specific employee, to instead adopt a framework that looked at the communications themselves and the benefits and goals of the privilege. "A primary reason that the *Upjohn* Court rejected the control group test was that in the Court's

---

[1] In a concurring opinion in *Upjohn*, Chief Justice Burger approved of the factors considered by the majority to conclude that the communications were privileged, but would have gone further to hold that the privilege would also protect communications with a former employee regarding conduct "within the scope of employment." *Upjohn*, 449 U.S. at 403 (Burger, C.J., concurring in part and concurring in the judgment).

eyes the restriction placed upon the relationship of the information-giver to the corporation undermined the purposes of the corporate attorney-client privilege." Sexton, *supra*, at 497. "[A]n approach that focuses solely upon the status of the communicator fails to adequately meet the objectives sought to be served by the attorney-client privilege." *Samaritan Found. v. Goodfarb*, 176 Ariz. 497, 501, 862 P.2d 870 (1993). By looking only at the identity of the former employee, the majority sidesteps around the important functional analysis contemplated by *Upjohn*.

II.   The Functional *Upjohn* Analysis Supports Extending the Attorney-Client Privilege to Communications with Former Employees for Purposes of Factual Investigation

At issue in this case is not, as the majority puts it, "whether postemployment communications between former employees and corporate counsel should be treated *the same as* communications with current employees," majority at 2 (emphasis added), but rather whether the corporate attorney-client privilege provides any protection for the communications between the former coaches and the counsel for the school district and the scope of any such protection. Though neither *Upjohn* nor *Youngs* had cause to consider whether and to what degree the privilege extends to former employees, the principles underlying these and other decisions support extending the privilege to former employees in certain circumstances based on the flexible analysis of *Upjohn*.

While it is well established that the attorney-client privilege attaches to corporations, the application of the privilege to corporations presents unique and special problems. *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 348, 105 S. Ct. 1986, 1991, 85 L. Ed. 2d 372 (1985). Unlike an individual client, who is

traditionally both the provider of information and the person who will act on a lawyer's advice, these roles of providing information and acting are often separated within a corporation. *Upjohn*, 449 U.S. at 391. As an inanimate entity, a corporation can act only through its agents and thus cannot itself speak directly to its lawyers. *Commodity Futures Trading Comm'n*, 471 U.S. at 348. And as the Court recognized in *Upjohn*, it will often be the lower-level employees who possess the information needed by corporate counsel in order to adequately advise the client. *Upjohn*, 449 U.S. at 391. Moreover, lower-level employees can and do, by their individual actions as agents of the corporation, embroil a corporate client in legal difficulties. *Id.* Thus, in at least some cases, the only way corporate counsel will be able to determine what the actions of its client (the corporation) were in order to provide relevant legal advice would be to speak with those lower-level employees that have knowledge of the relevant events and activities of the corporation.

Former employees, just like current employees, may possess relevant information pertaining to events occurring during their employment "needed by corporate counsel to advise the client with respect to actual or potential difficulties." *In re Coordinated Pretrial Proceedings in Petrol Prods. Antitrust Litig.*, 658 F.2d 1355, 1361 n.7 (9th Cir. 1981). Relevant knowledge obtained by an employee during his or her period of employment does not lose relevance simply because employment has ended. When former employees have relevant knowledge about incidents that occurred while they were employed, the extension of the attorney-client privilege to cover postemployment communications may further support the privilege's fact-finding

purpose. *See id.*; *In re Allen*, 106 F.3d 582, 606 (4th Cir. 1997). "[A] formalistic distinction based solely on the timing of the interview [between corporate counsel and the knowledgeable employee] cannot make a difference if the goals of the privilege as outlined in *Upjohn* are to be achieved." Sexton, *supra*, at 499.

The majority dismisses this "need to know" rationale as unpersuasive and as an unjustified extension of the purpose of the privilege. Majority at 11, 13. But the majority overlooks that this stated purpose—facilitating the flow of relevant and necessary information from lower-level employees to counsel—was a key function of the privilege identified by the Court in *Upjohn* and a critical reason that Court extended the privilege to lower-level employees in the first place. *See Upjohn*, 449 U.S. at 391.

Other courts have relied on *Upjohn*'s reasoning, and its acknowledgment that one purpose of the privilege is to facilitate the gathering of relevant facts by counsel, to justify extending the scope of the attorney-client privilege to cover at least some communications with former employees. *See, e.g., In re Coordinated Pretrial Proceedings*, 658 F.2d at 1361 n.7 ("Former employees, as well as current employees, may possess the relevant information needed by corporate counsel to advise the client with respect to actual or potential difficulties."); *Admiral Ins. Co. v. U.S. Dist. Court*, 881 F.2d 1486, 1493 (9th Cir. 1989) ("[T]he *Upjohn* rationale necessarily extended the privilege to former corporate employees . . . ."); *In re Allen*, 106 F.3d at 606 ("[W]e hold that the analysis applied by the Supreme Court in *Upjohn* to determine which employees fall within the scope of the privilege applies equally to former employees."); *Peralta v. Cendant Corp.*, 190 F.R.D. 38, 41 (D. Conn. 1999).

8

However, I acknowledge that *Upjohn*'s policies and purposes do not require us to consider former employees exactly as we consider current employees. Former employees present their own unique considerations: they probably do not communicate with corporate counsel "at the direction of corporate superiors," *Upjohn*, 449 U.S. at 394, and they do not hold an agency relationship with the corporate client such that their present or future actions could bind the corporation.

I am persuaded that the appropriate line is expressed in this simple test: Did the communications with the former employee, whenever they occurred, "relate to the former employee's conduct and knowledge, or communication with defendant's counsel, during his or her employment?" *Peralta*, 190 F.R.D. at 41. If so, the communications are privileged, consistent with *Upjohn*. *Id.* The *Peralta* court that adopted this test noted it was rejecting a wholesale application of the specific *factors* identified in *Upjohn* because former employees, unlike current employees, were not directed to speak with corporate counsel at the direction of management. *Id.* But the court relied on the rationale of *Upjohn*, which is to say the court looked to the purpose of the attorney-client privilege and whether that privilege was served by applying it to postemployment communications with a former employee—it held that the privilege applied to the extent the communications concerned the underlying facts in the case. *See id.*

The majority justifies departing from *Upjohn* on the basis that former employees "categorically differ" from current lower-level employees, such that the privilege should extend to their communications with corporate counsel. Majority at 9. The majority

focuses on agency principles and the policy announced in the *Restatement (Third) of the Law Governing Lawyers* § 73 (Am. Law Inst. 2000). *Id.* I reject these positions as incorrectly framed statements of the law, and because they are inconsistent with the functional framework of *Upjohn*.

The majority gives much weight to the fact that during employment, an employer can force an employee to disclose information to the corporation, but after employment, any such duty expires. Majority at 9-10. In addition, the majority notes that current employees owe duties of loyalty and obedience to the corporation, which also expire at termination. *Id.* (citing *Restatement (Third) of Agency* § 8.11 (Am. Law Inst. 2006)). Without this continuing duty to the corporation, the majority argues that a former employee becomes a simple third-party fact witness to whom the attorney-client privilege should not attach. *Id.*

The majority's premise is mistaken. *Upjohn* based its analysis of the attorney-client privilege on the idea that the attorney-client privilege, if applied to lower-level employees, would allow corporate counsel to obtain necessary and relevant information regarding the client, and with that information the attorney could inform the corporation's managers and officers of the corporation's legal duties and obligations. *Upjohn*, 449 U.S. at 392. The value the Court placed on the privilege to in effect promote the free and frank exchange of information presupposes that application of the privilege would foster communications that, but for the privilege, would never have occurred. *See* Sexton, *supra*, at 491; *Upjohn*, 449 U.S. at 389 (noting that a goal of the privilege is to promote "full and frank communication"). Moreover, notably missing from the

10

Supreme Court's analysis in *Upjohn* is any discussion of the roles that a duty of loyalty or obedience plays with respect to the attorney-client privilege. The privilege itself is not grounded in concepts of a duty on behalf of the client to disclose information to its attorney, just as its extension to lower-level employees is not based on their duty to provide information to the corporation.

Concepts of agency are undoubtedly relevant to the corporate attorney-client privilege, just not as the majority applies them. The rationale behind extending the privilege beyond the control group of the corporation is that lower-level employees, by virtue of their agency relationship with the corporation, have the authority to bind the corporation and control its actions in ways that can lead to legal consequences for the corporation. *See Upjohn*, 449 U.S. at 391; *see also Commodity Futures Trading Comm'n*, 471 U.S. at 348 (noting that a corporation is an inanimate entity that can act only through its agents). It is for this reason that corporate counsel should be able to speak frankly with those employees and agents who have knowledge of the events that relate to the subject of the lawyer's legal services, regardless of those employees' subsequent personal employment decisions. Extending the privilege to cover communications with former employees who were knowledgeable agents of the corporation with respect to the time period and subjects discussed in the communications ensures that this remains a privilege with the corporation and distinguishes these employees from third-party witnesses. Sexton, *supra*, at 497.

Temporal concepts associated with the duration of agency, as they relate to the timing a communication is made to counsel, should not be dispositive of the privilege,

11

as they bear little relationship to the goals of the privilege identified by the Supreme Court. It is for this reason that I would also reject the position articulated in the *Restatement (Third) of the Law Governing Lawyers* § 73(2) and comment e that the privilege be limited to those with a present and ongoing agency relationship with the corporation. Such a position is incompatible with the *Upjohn* Court's focus on the nature of the communications, rather than on the formalities of the relationship to the corporation. Furthermore, as the *Restatement* itself acknowledges, its position with respect to former employees is inconsistent with other courts that have considered the issue. *See* RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 73 cmt. e (acknowledging that of the few decisions on point, several courts disagree with the *Restatement*'s position regarding former employees).

III. Extending the Privilege to Former Employees Will Not Burden the Legal Process

The majority implies that extending the privilege to former employees would lack predictability and would frustrate the truth seeking mission of the legal process. Majority at 12, 13. While these concerns are not insignificant, I do not believe they justify the majority's harsh, bright-line rule.

First, we have continuously held that the attorney-client privilege extends only to communications and does not protect the underlying facts. *Youngs*, 179 Wn.2d at 653; *Wright*, 103 Wn.2d at 195. Highland has always allowed, and concedes, that Newman may continue to conduct ex parte interviews with the former coaches for the purposes of learning any facts of the incident known to the coaches. *See* Pet'r's Reply Br. at 14.

The attorney-client privilege exists because we recognize that the relationship between attorney and client is important and worth protecting, even at the expense of some measure of truth seeking. *Lowy v. PeaceHealth*, 174 Wn.2d 769, 785, 280 P.3d 1078 (2012) ("[T]he attorney-client . . . privilege[] [is] . . . founded on the premise that communication in th[is] relationship[] is so important that the law is willing to sacrifice its pursuit for the truth, the whole truth, and nothing but the truth."). Where we have defined the scope or extended the attorney-client privilege, we have done so in recognition of the important purposes the privilege seeks to protect. *See, e.g., Youngs*, 179 Wn.2d at 650; *Dietz v. John Doe*, 131 Wn.2d 835, 849, 935 P.2d 611 (1997). And we have sought to equitably balance the values underlying the privilege against concerns over burdening discovery. *See, e.g., Dietz*, 131 Wn.2d at 849. In *Dietz*, we addressed the question of whether the attorney-client privilege extends to protect the disclosure of a client's identity, when doing so may implicate the client in potential wrongdoing. *Id.* at 839. We noted that in such a case, application of the attorney-client privilege would stand at odds with principles of open discovery and "a general duty to give what testimony one is capable of giving." *Id.* at 843 (internal quotation marks omitted) (quoting *Jaffee v. Redmond*, 518 U.S. 1, 9, 116 S. Ct. 1923, 135 L. Ed. 2d 337 (1996)).

While we extended the privilege in *Dietz*, we recognized our need to keep that particular extension narrow. *Id.* at 849. "The privilege is *imperative* to preserve the sanctity of communications between clients and attorneys." *Id.* at 851 (emphasis added). Moreover, the truth seeking concerns expressed by the majority are less

13

serious here than in *Dietz* because application of the privilege will not prohibit discovery of relevant facts; Newman remains able to interview the former coaches. By contrast, in *Dietz* the privilege presented a complete obstacle to learning the identity of a potentially at-fault party. *See Dietz*, 131 Wn.2d at 848-49. The policies underlying the privilege support its extension in this case, and truth seeking principles do not justify a different conclusion.

Second, like the majority, I too recognize the value of predictability with respect to the boundaries of the attorney-client privilege. Because attorneys and clients must be able to predict with at least some certainty where their discussions will be protected, "[a]n uncertain privilege . . . is little better than no privilege at all." *Upjohn*, 449 U.S. at 393. But such concerns do not require that we sever our analysis from the guiding principles of *Upjohn*; rather, we must use those principles to set clear standards for parties and courts to follow.

The distinction I would draw today should not be difficult for the parties to apply if the relevant purpose of the privilege—promoting necessary factual investigation—is kept clear. *Accord Peralta*, 190 F.R.D at 41. It will be incumbent on counsel to exercise caution when communicating with their client's former employees in order to ensure communications stay within these parameters. Should disputes arise as to whether a specific communication is privileged, they should be submitted to the trial court for a determination as to whether the purposes identified today would be furthered by its application.

14

IV.    Application to the Facts of This Case

In this case, the trial court ordered Highland School District No. 203 to respond to discovery requests concerning the "disclosure of communications between defense counsel and former employees made after the employment ended and not during the time defense counsel claims to have represented the former employees for purposes of their depositions." Clerk's Papers at 68-70. The trial court ordered this disclosure after erroneously concluding that we have not adopted *Upjohn*[2] and on the determination that the attorney-client privilege does not apply to any postemployment communications with former employees. *Id.* at 69-70.

Matthew Newman has brought claims against the school district based on the Lystedt act, under which coaches who know or suspect an athlete is suffering from a concussion must remove the athlete from play until the athlete receives proper medical clearance. *See* RCW 28A.600.190; Pet'r's Am. Br. at 4-6; Br. of Resp'ts 6-7. Thus, Highland's liability in this case is contingent on the actions and knowledge of its football coaches who were employed during the time Newman played football for Highland School District and were present when Newman allegedly suffered a concussion and/or injury, regardless of whether those coaches remain employed by the district today. *See* CP at 96-104 (Compl.).

The former coaches at issue were employed by Highland during the relevant time period when Newman was injured. *See, e.g.,* CP at 1267. They possessed

---

[2] The trial court issued its order on January 28, 2014, just five days after our decision in *Youngs*, 179 Wn.2d 645. CP at 70.

15

knowledge of matters "within the scope of their duties" as football coaches for the school district, such as the training they received and their interactions with and observations of Newman before and during his injury. *See, e.g.*, CP at 230-32, 1267, 1587-89. Communications with Highland's counsel that concerned the former coaches' knowledge and conduct during their employment and the events surrounding Newman's injury would be necessary to supply a basis for legal advice to the school district as to liability.

In light of these facts, the purposes underlying the privilege support its extension to communications with former coaches regarding their conduct and knowledge during employment. This extension would promote frank and open fact-finding, and enable the attorney to uncover the facts necessary to render legal advice to the client. *Cf. In re Allen*, 106 F.3d at 606. To the extent communication between the former coaches and Highland's attorneys concerns a factual inquiry into the former coaches' conduct and knowledge during his or her employment, I would hold that any such communications are privileged and Highland need not answer questions regarding these communications. I would conclude that postemployment communications between the former employer's counsel and a former employee that constitute a relevant factual inquiry into their conduct and knowledge during employment would be privileged, consistent with *Upjohn*. Thus, I would hold that the trial court's order compelling discovery is based on an incorrect interpretation of the law and should be reversed.

This conclusion, however, does not completely resolve the current dispute between the parties about the postemployment communications with former coaches.

16

Newman contends that the communications at issue concern more than just fact-finding. Br. of Resp'ts at 25-30. Newman argues that the predeposition communications with former coaches should not be privileged because the purpose of these predeposition, postemployment communications was not fact-finding, but rather to "'woodshed[]'" the witness and influence the witness's testimony.[3] Br. of Resp'ts at 25-27, 30.

Some of this controversy stems from the unusual circumstance that Highland's attorneys formally appeared for and represented the former coaches for purposes of their depositions.[4] The trial court allowed this representation,[5] and Newman did not challenge this order on appeal. Thus, Newman seeks, and the trial court order compelled, discovery of communications made only "when defense counsel did not represent the former employees for the purposes of the depositions." CP at 68-70. The communications to prepare the former coaches for a deposition do not appear to fall within the court's order to compel, as the actual representation of the former coaches may potentially include these predeposition meetings between defense counsel and

---

[3] The record and briefing indicate that each party has accused the other of witness tampering in this case. *See, e.g.,* Br. of Resp'ts at 30; CP at 830.

[4] When asked by the trial court what it meant to represent for purposes of the deposition, the attorney representing Highland stated, "It means that I can interview them, talk to them about the facts, what they recall, give them ideas as to what I think subject matters will come up so they're somewhat prepared as to the questions." Verbatim Report of Proceedings (VRP) at 44 (Sept. 27, 2013).

[5] This issue came before the trial court on a motion to disqualify defense counsel filed by Newman. *Id.* at 42. The trial court expressed concerns about defense counsel's representation of these former employees and the potential conflicts this posed. VRP at 117. The trial court concluded this was "a very poor decision" but that it was not necessarily an ethics violation. *Id.* The trial court ordered Highland's counsel not to engage in any further representation of former coaches for depositions. CP at 68-70. The parties have not challenged this ruling in the present appeal, and the merits of this ruling are not properly before the court.

17

the former coaches. *See, e.g.,* CP at 226-27 (Dep. of Dustin Shafer) (noting that a discussion with defense counsel regarding formal representation for purposes of Shafer's deposition occurred at a meeting with counsel one week prior to his deposition).

However, the record is unclear as to when the school district's defense counsel represented the former coaches. Without knowing the scope of the communications at issue, whether they were limited to a factual inquiry into the former employee's conduct and knowledge during his or her employment, and whether or not such communications occurred during the period of formal representation, it is impossible to tell whether the communications at issue meet the test I suggest today.

Accordingly, I would vacate the trial court's order to compel. On remand, the plaintiff would not be entitled to the broad discovery of communications with former coaches during the time the coaches were represented, as he has requested. CP at 37-43. And if such broad requests are made, defendant may raise the privilege again to the extent such communications fell within the scope of the direct representation, or to the extent such communications were made as a factual inquiry concerning the former employee's conduct and knowledge during his or her employment, relevant to the underlying case. Consequently, discovery should and would be tailored to specific questioning regarding communications falling outside the bounds of normal factual inquiry and thus is outside the scope of the attorney-client privilege with former employees.

V.    Contempt Sanctions and Attorney Fees

I would also vacate the trial court's order imposing contempt sanctions of $2,500 per day on Highland until discovery is provided. We previously placed a broad order staying all matters before the trial court related to the discovery of allegedly privileged communications, which put a stay on the contempt sanctions order. Because I would reverse the trial court's order compelling production, I would also vacate the order imposing sanctions on Highland.

I also join in the majority's denial of Newman's request for attorney fees.

## CONCLUSION

I would hold that the attorney-client privilege attaches to postemployment communications concerning a relevant factual inquiry into the former employee's conduct and knowledge during his or her employment. The former coaches in this case had relevant information within the scope of their employment, and to the extent these communications concerned their knowledge and conduct during employment with Highland, such communications would be privileged. I would vacate both the trial court's order to compel and contempt order, lift the stay of discovery, and remand for further proceedings consistent with this opinion.

No. 90194-5
(Wiggins, J., dissenting)

I dissent.

<u>Wiggins, J.</u>
John McCld, J.
Owens, J.
Madsen, C.J.

20