IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| MICHAEL K. SNYDER, individually,<br><br>               Respondent,<br><br>        v.<br><br>VIRGINIA MASON MEDICAL CENTER,<br><br>               Petitioner,<br><br>JARED BRANDENBERGER, MD., and JOHN and JANE DOE PHYSICIANS, UNKNOWN JOHN and JANE DOE NURSES,<br><br>               Defendants. | No. 83526-2-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

CHUNG, J. — Michael Snyder filed suit against Virginia Mason Medical Center (VMMC) for medical negligence based on injuries incurred after his aorta was punctured during surgical placement of a dialysis catheter. Three of the physicians involved in his care are no longer employed by VMMC, but are insured by VMMC for actions arising out of the care they provided during their employment. During discovery, it came to light that VMMC counsel had engaged in ex parte contact with the nonparty physicians.

This case, which comes to this court on discretionary review, concerns the application of Loudon v. Mhyre, 110 Wn.2d 675, 756 P.2d 138 (1998), which prohibits defense counsel in a personal injury case from ex parte contact with

plaintiff's non-party treating physicians. This case also raises the issues of whether a showing of prejudice is required for sanctions for <u>Loudon</u> violations and whether a failure to screen a hospital quality improvement committee member from litigation precludes the protection of information from discovery under Washington's hospital quality improvement (QI) statute, RCW 70.41.200.

We hold that the trial court correctly determined that the <u>Loudon</u> rule applies and prohibits ex parte contact between VMMC counsel and the former employee nonparty physicians. We also conclude that the party seeking sanctions for a <u>Loudon</u> violation must establish prejudice. Finally, while screening QI committee members from defense counsel in a malpractice action allows hospitals to engage in their statutory QI obligations while still preserving <u>Loudon</u> protections, failure to screen does not operate as a waiver of the QI protection. We therefore affirm the trial court's rulings regarding the applicability of <u>Loudon</u> and remand for further proceedings.

## BACKGROUND

The allegations in the underlying complaint[1] are as follows: On January 16, 2018, Snyder underwent a multi-faceted surgical procedure including placement of a subclavian dialysis catheter at VMMC. Dr. Jared Brandenberger was the lead surgeon. During placement, the catheter migrated into Snyder's chest. Due to this complication, a vascular surgeon was called to the operating

---

[1] As this case is before us on discretionary review of pretrial orders relating to discovery, the background information herein regarding the incident that gave rise to the lawsuit draws from the allegations in Snyder's complaint.

room to assist. When the catheter was removed, Snyder's blood pressure dropped and he became unstable. He suffered a massive hemorrhage necessitating significant surgical repair, as well as a prolonged cardiac arrest requiring 20 to 30 minutes of resuscitation. Snyder incurred permanent and disabling injuries, including a "watershed brain injury."

Snyder filed suit against VMMC, Dr. Brandenberger, and unknown physicians and nurses, alleging liability under common law and statutory negligence, corporate negligence, respondeat superior, and res ipsa loquitur. In April 2020, VMMC disclosed a list of approximately 100 treating health care providers who might testify in the case, but did not identify the physicians' roles in the surgery. The list was accompanied by the statement: "The identity of those persons and the relevant knowledge they may possess is more readily available to plaintiff's counsel than defense counsel because plaintiff knows the involvement those providers have had and plaintiff's counsel can contact those providers while defense counsel cannot."

During discovery, Snyder learned that Dr. Aranson was the vascular surgeon who had been called in to assist, and medical residents Drs. Weslee Chew and Molly Downey had been involved in placement of the catheter. All three physicians subsequently left VMMC for employment elsewhere. VMMC listed all three among the witnesses identified as treating physicians its counsel "cannot" contact.

VMMC is self-insured and, under the terms of its employment contract, provides professional liability insurance to physicians accused of medical negligence arising out of care provided within the course and scope of their employment. In such cases, VMMC must provide legal counsel to the physicians. The physician must fully cooperate with VMMC, its insurers, and appointed defense counsel in any claim or suit. Upon discovering that Drs. Aranson, Chew, and Downey were involved in providing the allegedly negligent care and would likely be deposed in the lawsuit, pursuant to its contractual obligations, VMMC hired separate counsel for their representation. VMMC contacted the three physicians to notify them of the litigation and assignment of counsel.

In addition, Michael Glenn, Chief Medical Officer (CMO) at VMMC at the time, decided to meet personally with Dr. Chew, who by that time had moved to Prosser, Washington. In his capacity as CMO, Dr. Glenn was on VMMC's quality oversight committee and also met monthly with the person in charge of the residency program. Dr. Glenn had been told Dr. Chew had taken the complications in Snyder's case "very hard" and that he knew he would be upset about the litigation and wanted to support him, as well as explain that the fact that VMMC retained separate counsel for him did not mean "that we were blaming him or hanging him out to dry." Dr. Glenn stated he decided to be the one to meet with him, given his role as CMO, and that he did not discuss the surgery or details of the litigation with Dr. Chew.

4

During depositions, Snyder's expert witnesses offered testimony that Dr. Aranson's actions during surgery caused the injury. When Dr. Aranson's counsel unsuccessfully requested copies of the expert transcripts from plaintiff, VMMC provided the transcripts to his counsel. Dr. Aranson directed his counsel to file a motion to intervene in order to protect his interests. The court allowed Dr. Aranson to intervene as an individual defendant. The claims against Dr. Aranson individually were eventually dismissed as barred by the statute of limitations, but the claims against VMMC for his conduct were allowed to continue.

After Dr. Aranson intervened, Snyder made a discovery request for any communications with nonparty healthcare providers involved in his treatment, as well as any joint defense agreements, retention agreements, billing guidelines, and consent or conflict waivers with any of the nonparty health care providers involved including Drs. Aranson, Chew, and Downey. VMMC moved for a protective order. Snyder replied that "it became unequivocally clear" that by disclosing the expert deposition transcripts, VMMC and physicians' counsel had "violated the prohibition in Loudon v. Mhyre, 110 Wn.2d 675 (1988) on ex parte contacts between defendant and plaintiff's treating physician."

The trial court appointed a Special Master to review materials produced by VMMC and to identify any responses "relevant to the issue of [VMMC's] ex parte communication" with Snyder's non-party treating physicians. The Special Master identified 30 documents that constituted ex parte communications. In September 2021, the court ordered VMMC to produce the documents identified by the

5

Special Master to Snyder, overruling VMMC's privilege objections. Snyder filed a motion to direct the Special Master to produce all records to the trial court for reevaluation. On October 2021, the court set a CR 16 conference and reserved ruling, but provided analysis making it clear that it believed VMMC had violated the Loudon prohibition and that the common interest privilege did not override the considerations of Loudon and its progeny. After the CR 16 conference, in November 2021, the trial court again reserved ruling on in camera review but concluded that the parties were bound by its analysis of the scope of the Loudon violation in the October 2021 order. Accordingly, the court ordered VMMC to produce to Snyder a privilege log VMMC had provided to the Special Master and to produce to the court for in camera review any correspondence from hospital's counsel to the Special Master that had not yet been provided to Snyder.

VMMC then moved the court to allow ex parte privileged communications with Drs. Aranson, Downey, and Chew. VMMC also filed a notice of discretionary review of the court's prior order. The matter was stayed pending resolution of the motion to allow ex parte communications. On January 7, 2022, the trial court denied the motion, and VMMC amended its notice of discretionary review to include the denial.

VMMC produced the privilege log as required by the court order. Snyder renewed his motion to direct the Special Master to produce all submitted documents for in camera review. The court denied the motion by order dated February 11, 2022. Snyder filed a notice of discretionary review of this decision.

6

The court subsequently granted Snyder's motion for reconsideration on March 24 and ordered the Special Master to submit all documents to the court under seal.

Snyder also filed a motion to enforce and compel discovery of quality assurance documents identified by VMMC in its privilege log as protected by the QI Committee privilege in RCW 70.41.200(3). After reviewing the documents, the trial court concluded the documents were protected under the QI Committee privilege and denied the request on February 22, 2022. On March 14, in a "conditional" notice of discretionary review, Snyder sought review of this decision as well as the February 11 order denying in camera review.

Snyder then moved for default judgment against VMMC as a sanction for Loudon violations. On March 18, 2022, the trial court denied the motion without prejudice, because "this court lacks the information to determine if the violation substantially prejudiced plaintiff." On March 28, Snyder amended his notice of discretionary review to also seek review of this decision.

A commissioner of this court reviewed the motions for discretionary review. VMMC's motion was granted on the narrow issue of "whether Loudon prohibits defense hospital's counsel from communicating ex parte with the non-party physicians whose allegedly negligent care gives rise to the hospital's liability." As to Snyder's motion, while it did not meet the grounds for discretionary review, invoking the interests of judicial economy, the commissioner allowed Snyder to brief, for the court's consideration as appropriate, two issues: "whether a showing of prejudice is required for sanctions for Loudon violations and

7

whether and to what extent a QI committee member's participation in the litigation precludes the hospital's assertions of the QI privilege." The commissioner consolidated the petitions for our review.

## DISCUSSION

I.      Application of _Loudon_ to VMMC's Ex Parte Communications with Snyder's Nonparty Physicians

VMMC seeks review of the trial court's orders of October 29, 2021, November 19, 2021, and January 7, 2022, that conclude that Loudon prohibits hospital counsel from communicating ex parte with the three nonparty physicians, Drs. Aranson, Chew, and Downey. We review a superior court's discovery order for abuse of discretion. T.S. v. Boy Scouts of Am., 157 Wn.2d 416, 423, 138 P.3d 1053 (2006). A superior court abuses its discretion where the court's decision was manifestly unreasonable or made for untenable reasons. Id. Further, a superior court abuses its discretion if its decision is based on the wrong legal standard, or on an improper understanding of the law. Id. at 423-24. A trial court's interpretation of statutes and judicial decisions constitute issues of law that we review de novo. Hermanson v. MultiCare Health Sys., Inc., 196 Wn.2d 578, 585, 475 P.3d 484 (2020).

The statutory physician-patient privilege protects physicians from being compelled, without the consent of their patient, to "be examined in a civil action as to any information acquired in attending such patient, which was necessary to enable him or her to prescribe or act for the patient." RCW 5.60.060(4). A patient waives the privilege by filing a personal injury suit. RCW 5.60.060(4)(b). Such

waiver[2] of the privilege "is not absolute, however, but is limited to medical information relevant to the litigation." Loudon, 110 Wn.2d at 678. "The danger of an ex parte interview is that it may result in disclosure of irrelevant, privileged medical information . . . . The plaintiff's interest in avoiding such disclosure can best be protected by allowing plaintiff's counsel an opportunity to participate in physician interviews and raise appropriate objections." Loudon, 110 Wn.2d at 678. Thus, Loudon established that in a personal injury action, "defense counsel may not engage in ex parte contacts with a plaintiff's physicians." Id. at 682. Stated another way, "Loudon clearly establishes a patient-plaintiff's right to supervise his nonparty physician's communications with opposing counsel." Youngs v. PeaceHealth, 179 Wn.2d 645, 660, 316 P.3d 1035 (2014).

"By protecting against the disclosure of information *irrelevant* to the litigation, the Loudon rule furthers a primary purpose of the patient privilege statute—protecting patient confidentiality—even though the plaintiff has waived the absolute privilege from discovery about *relevant* matters." Youngs, 179 Wn.2d at 659 (emphasis added). In addition to furthering the patient's confidentiality interest, the Youngs court recognized three "distinct functions" that the Loudon rule also serves: it protects the doctor-patient fiduciary relationship; it protects the physician's interest in avoiding inadvertent wrongful disclosures; and

---

[2] At the time of Loudon, the physician-patient privilege did not include a waiver provision, but a "judge-made waiver . . . was already well established when Loudon was decided." Youngs v. PeaceHealth, 179 Wn.2d 645, 657-58, 316 P.3d 1035 (2014). Subsequent to Loudon, in 1986 and 1987, the legislature amended the physician-patient privilege to include an automatic waiver 90 days after a plaintiff files a claim for personal injury or wrongful death. Id. at 658; RCW 5.60.060(4).

"it aids in proper trial administration, preventing the occasion from arising where defense counsel might be called to testify as an impeachment witness." Id. at 659-60.

In Youngs, 179 Wn.2d at 650, the court "created an exception" to the Loudon rule when it conflicts with the corporate attorney-client privilege. Hermanson, 196 Wn.2d at 586 (describing Youngs). The court considered whether "Loudon bars ex parte communications between a physician and his or her employer's attorney where the employer is a corporation and named defendant whose corporate attorney-client privilege likely extends to the physician." Youngs, 179 Wn.2d at 650. This required the court to balance the patient-physician interests defined in Loudon with the purposes of the attorney-client privilege. Id. Because, the purposes of the attorney-client privilege are to " 'facilitate[] the full development of facts essential to proper representation of the client [and] . . . encourage[] lay[people] to seek early legal assistance,' " the attorney-client privilege can apply to corporate counsel's communications with nonmanagerial employees. Youngs, 179 Wn.2d at 662 (quoting Upjohn Co. v. United States, 449 U.S. 383, 391, 101 S. Ct. 677, 66 L. Ed. 2d 584 (1981)). The Youngs court noted that while Loudon and Upjohn protect different types of communication, they conflict because

> certain ex parte communications between a hospital's corporate defense counsel and hospital employees may be protected by Upjohn but barred by Loudon. Indeed, depriving counsel of the ability to communicate confidentially with a client damages the privilege just as much as disclosing a prior communication [between physician and patient] does.

10

<u>Youngs</u>, 179 Wn.2d at 662-63. The court resolved the conflict by holding "that the corporate attorney-client privilege trumps the <u>Loudon</u> rule where an ex parte interview enables corporate counsel 'to determine what happened' to trigger the litigation." <u>Youngs</u>, 179 Wn.2d at 664 (quoting <u>Upjohn</u>, 449 U.S. at 392). The court explained,

> Under this rule, corporate defense counsel may have privileged ex parte communications with a plaintiff's nonparty treating physician only where the communication meets the general prerequisites to application of the attorney-client privilege, the communication is with a physician who has direct knowledge of the event or events triggering the litigation, and the communications concern *the facts of the alleged negligent incident*. The <u>Loudon</u> rule still bars ex parte interviews as to information about prior and subsequent treatment (i.e., information about the plaintiff's particular vulnerabilities or the nature of the plaintiff's recovery or disabilities). This rule strikes the proper balance between the attorney-client and physician-patient privileges, limiting <u>Loudon</u>'s prophylactic protections to the extent necessary to protect a corporate defendant's right to fully investigate its potential liability.

<u>Youngs</u>, 179 Wn.2d at 664-65. The court concluded by "reiterat[ing] that the attorney-client privilege protects communications, but not the facts underlying those communications." <u>Id.</u> at 665.[3]

In <u>Newman v. Highland School District No. 203</u>, the Supreme Court limited the corporate attorney-client privilege,[4] holding it did not extend to former employees. 186 Wn.2d 769, 780, 381 P.3d 1188 (2016). The court reasoned that

---

[3] The <u>Youngs</u> court also declined to distinguish between written communications and ex parte interviews. 179 Wn.2d at 665 (citing <u>Smith v. Orthopedics Int'l, Ltd.</u>, 170 Wn.2d 659, 244 P.3d 939 (2010)).

[4] <u>Newman</u> was not in the <u>Loudon</u> context and did not involve the physician-patient privilege; it involved counsel for a school district and former football coaches whose actions were alleged to have given rise to plaintiff's injuries. 186 Wn.2d at 774-76.

former employees categorically differ from current employees with respect to the interests underlying the attorney-client privilege, as termination of the employer-employee relationship generally means that the former employee can no longer bind the employer and no longer owes a duty of loyalty and confidentiality to the employer. Id. at 780. "Without an ongoing obligation between the former employee and employer that gives rise to a principal-agent relationship, a former employee is no different from other third-party fact witnesses to a lawsuit, who may be freely interviewed by either party." Id. at 780-81.

In the Supreme Court's most recent case addressing the Loudon rule, Hermanson, the court allowed MultiCare to have ex parte communications with a physician who was an independent contractor, not a MultiCare employee, pursuant to the attorney-client privilege. 196 Wn.2d at 581. Relying on Newman, the court reasoned that although the physician, Dr. Patterson, was an independent contractor, he "maintain[ed] a principal-agent relationship with MultiCare such that they should be allowed to have ex parte communications limited by our holding in Youngs." Hermanson, 196 Wn.2d at 587-88. "MultiCare control[led his] conduct by ensuring he abide[d] by MultiCare's policies and procedures," id. at 588-89, and unlike most independent contractors who work on a project-by-project basis, Dr Patterson "constantly perform[ed] work in a MultiCare facility that is consistently monitored by MultiCare," so he was the "functional equivalent" of a MultiCare employee. Id. at 589-90. Thus, the

12

defendant hospital was permitted ex parte communications with the physician, "limited to the facts of the alleged negligent event."[5] Id. at 590.

Here, the nonparty treating physicians are former employees of the defendant hospital. Snyder contends that Loudon applies and the corporate attorney-client privilege does not allow for ex parte communication with non-employees. VMMC claims that the rationale of Loudon does not apply "where the plaintiff has placed the care of the targeted physicians at issue, proclaimed them his legal adversaries, and thereby waived any physician/patient privilege that would otherwise apply."

More specifically, VMMC argues first, that "Loudon does not bar contact between corporate counsel and providers whose care is said to give rise to vicarious liability of the corporation." Brief of App. at 28. Thus, VMMC seeks an exception to the Loudon rule when the only treatment provided by the nonparty physician is the conduct at issue in the lawsuit. But the Hermanson court considered—and rejected—the parties' arguments "regarding whether MultiCare's alleged vicarious liability for [the physician's] actions affects whether MultiCare and [the physician] should be allowed to have ex parte communications." 196 Wn.2d at 590. The court explained, "Whether there is

---

[5] In Hermanson, the plaintiff did not bring claims for medical malpractice, but for negligence, defamation/false light, false imprisonment, violation of the physician-patient privilege, and unauthorized disclosure of his health information. Id. at 583. After Hermanson sideswiped a vehicle and crashed into a utility pole, he received care at a hospital owned by MultiCare, including from Dr. Patterson. Id. at 582. During his treatment, an unidentified person at the hospital gave him a blood test that showed a high blood alcohol level, and someone reported this information to the police, who subsequently charged Hermanson with negligent driving and hit and run of the vehicle. Id. at 582-83.

vicarious liability between two defendants is separate from whether such parties may have ex parte communications with one another under evidentiary privilege." Id. at 590. When the physician is still an employee of the corporate defendant, or maintains a principal-agent relationship, as in Hermanson, then Youngs applies, and the Loudon rule gives way to the attorney-client privilege. But once the physician no longer retains that agency relationship, under Newman, they are third-party fact witnesses to a lawsuit, and the attorney-client privilege does not protect their communications with their former employer—even if their conduct is at issue in the lawsuit, as it was in Newman. See Newman, 186 Wn.2d at 774.[6]

VMMC also suggests the rationale for barring ex parte contact under Loudon rule does not apply here.[7] VMMC argues that because Drs. Aranson, Chew, and Downey had no post-discharge relationship with Snyder that would be "chilled" and because Snyder himself placed the care at issue, there was no danger that irrelevant, privileged medical information would be disclosed. But the

---

[6] As here, in Newman, the communications between corporate counsel and the former employees as to which the corporate defendant claimed attorney-client privilege occurred after the former employees left the defendant's employment. See Newman, 186 Wn.2d at 775-76 & n.1. But unlike here, at the time of the communications at issue in Newman, the non-employee witnesses were not represented by the counsel appointed by the corporate defendant. Id. at 774 (trial court ruled that defendant school district's counsel could not represent the non-employee witnesses in the future).

[7] Further, VMMC's reliance on Holbrook v. Weyerhaeuser Co., 118 Wn.2d 306, 822 P.2d 271 (1992), to suggest that Loudon does not apply is misplaced. Holbrook was an industrial insurance claim, for which the governing statute states, "[a]ll civil actions and civil causes of action for such personal injuries . . . are hereby abolished," except as provided in Chapter 51.04 RCW. Id. at 310-11. Then, RCW 51.04.010 expressly removes the physician-patient privilege in "all hearings, actions, or proceedings" in such cases, whether before the department, board of industrial insurance appeals, or a court on appeal from the board. This statutory removal of privilege in this particular kind of case does not provide a basis for determining the Loudon rule should not apply to a medical negligence case such as this.

14

fact that Snyder brought suit based on the physicians' conduct does not entirely waive the privilege; "[w]aiver is not absolute, however, but is limited to medical information relevant to the litigation." Loudon, 110 Wn.2d at 678. "[The Loudon court's] analysis makes clear that a waiver of the patient privilege triggers, rather than cancels, the Loudon protections." Youngs, 179 Wn.2d at 658. Further, Loudon's protections do not depend on whether the physician treated the patient only once or has an ongoing relationship, and Loudon does not require an inquiry into whether the communications between patient and physician in a specific case are in fact chilled. The underlying premise of Loudon is that a physician who has treated the patient holds some information that is relevant to the claim, and there is a danger of disclosure beyond that information.

Even if in fact the physician's treatment was limited to the conduct that is at issue, and thus has only information relevant to the claim, there are other hazards that the Loudon rule is intended to prevent by limiting defense counsel's ex parte contact with treating physicians. In a case such as this, where the physicians' conduct is the basis for the claims, the concern about ex parte contact is heightened because the hospital has an incentive to shape the physicians' presentation of the relevant facts. The plurality in Smith recognized this additional hazard of ex parte contact: "[P]ermitting contact between defense counsel and a nonparty treating physician outside the formal discovery process undermines the physician's role as a fact witness because during the process the physician would improperly assume a role akin to that of an expert witness for

15

the defense." 170 Wn.2d at 668. This potential for the nonparty treating physician to assume the role of a nonretained expert for the defense could chill communications between patient and physician. Id. The plaintiff-patient may choose to waive the protection and allow such ex parte contact,[8] but defense counsel may not simply decide on its own to engage in such ex parte contact without leave, as happened in this case.

VMMC argues that if Loudon does not apply, application of attorney-client privilege is not necessary to overcome it. App. Reply at 17. VMMC also suggests that Newman does not prohibit ex parte contact with prior employees, and, because its argument "is not premised on the existence of any attorney-client privilege between its counsel and the targeted providers," it may " 'freely interview[]' " the physicians, who are " 'no different from other third-party fact witnesses.' " Brief of App. at 44, 46 (quoting Newman, at 780-81). But this argument completely sidesteps the core protection at issue here that limits VMMC's ex parte contact in the first place. The Loudon protection is grounded not only in the physician-patient privilege, but in the recognition that "the

---

[8] This was the situation in both lawsuits that were consolidated in Youngs. Plaintiff Marc Youngs did not object to ex parte contacts between PeaceHealth's defense counsel and the two doctors he identified whose conduct gave rise to his lawsuit, but he did object to ex parte contact with any other physician who treated him at St. Joseph (a PeaceHealth facility), even though he had suggested in discovery responses that he might bring claims against several additional, unidentified physicians. Youngs, 179 Wn.2d at 654. In the companion case, plaintiff Aolani Glover brought suit based on treatment by Harborview emergency room staff. Id. at 655. Initially she objected to defense counsel's ex parte communications with her treatment physicians at Harborview outside the emergency department. Later, she removed her objections to those contacts as long as those individuals were not shown any records of her subsequent care at UW Medical Center (UWMC). Id. at 656. In response, the trial judge issued an order prohibiting defense counsel from ex part contact with only her treating physicians at UWMC. Id.

'relationship between physician and patient is 'a fiduciary one of the highest degree . . . involv[ing] every element of trust, confidence and good faith.' " Youngs, 179 Wn.2d at 651 (quoting Smith v. Orthopedics Intern., Ltd., 170 Wn.2d 659, 667, 244 P.3d 939 (2010)). The fiduciary relationship does not disappear when the physician leaves the employ of a particular employer.[9]

Having stated that its argument "is not premised on" the attorney-client privilege, VMMC contends the common interest privilege applies, and that this privilege, too, trumps the Loudon protections. Brief of App. at 52. But the trial court found VMMC had not established "any joint representation agreement or other means by which [physicians' counsel] had a privileged relationship with counsel for and/or representatives for Virginia Mason." "Under the 'common interest' rule, 'communications exchanged between multiple parties engaged in a common defense remain privileged under the attorney-client privilege.' " Broyles v. Thurston County, 147 Wn. App. 409, 442, 195 P.3d 985, (2008) (quoting C.J.C. v. Corp. of Catholic Bishop of Yakima, 138 Wn.2d 699, 716, 985 P.2d 262 (1999)). The application of the common interest doctrine depends on a factual determination that a common interest or joint representation or defense agreement exists. See Kittitas County v. Allphin, 195 Wn. App. 355, 368, 381 P.3d 1202 (2016) (one of the requirements for application of the common interest privilege is that "the communication was made by separate parties in the course

---

[9] In addition, VMMC's argument ignores that the physicians here are represented by counsel, and, thus, they may not "freely interview" them, as ethical rules limit direct contact with represented parties. RPC 4.2.

of a matter of common interest or joint defense"); Morgan v. City of Fed. Way, 166 Wn.2d 747, 757, 213 P.3d 596 (2009) (Morgan failed to provide any evidence demonstrating a common legal interest). VMMC did not challenge the trial court's finding that there was no such agreement. Therefore, we do not address whether the common interest doctrine could trump the Loudon protections and can be a basis for ex parte communications, as the factual record does not present this issue.

Finally, VMMC argues that because it insures its physicians for acts taken during the course of their employment, it must be allowed to contact its insureds. The physicians' employment contracts obligated VMMC to insure and provide legal counsel for them. VMMC states that as their "insurer," VMMC arranged for the physicians to have separate counsel and paid for the representation. But an arrangement to pay for the representation does not equate to a privilege to which the physician-patient privilege and the Loudon protections must give way. The exception in Youngs relied on the important purposes for the attorney-client privilege, and the need for corporate counsel to determine what happened to trigger the litigation. Youngs, 179 Wn.2d at 645. An agreement to pay for a physician's defense does not involve the same concerns or serve the same purposes as the corporate attorney-client privilege.[10] Indeed, in Hermanson, our

---

[10] While an insured's statements to its insurer are protected from discovery under CR 26(b), the purpose for this protection is not the same as the purposes underlying the attorney-client privilege. See Heidebrink v. Moriwaki, 104 Wn.2d 392, 400-01, 706 P.2d 212 (1985) (extension of work product protection under former CR 26(b)(3), now CR 26(b)(4), "comports with the policy of maintaining certain restraints on bad faith, irrelevant and privileged inquiries and helps to ensure the just and fair resolution of disputes").

18

Supreme Court rejected the argument that a corporation could enter into a representation agreement with the physician and thereby trump the Loudon rule and be allowed ex parte contact. Hermanson, 196 Wn.2d at 590 n.1.[11] The court reasoned that this argument "would allow any corporation to circumvent a plaintiff's physician-patient privilege by entering into a representation agreement with a treatment physician, rendering the physician-patient privilege moot whenever the corporation chooses." Id. We decline to limit the Loudon prohibition on ex parte contact.

In sum, the Loudon rule prohibits ex parte contact with nonparty physicians, unless the communication is subject to the corporate attorney-client privilege. "Loudon does not prohibit the acquisition of knowledge; it merely imposes procedural safeguards to prevent improper influence or disclosures." Youngs, 179 Wn.2d at 670. As the Loudon court noted, "any hardship [to] the defendants by having to use formal discovery procedures outweighs the potential risks involved with ex parte interviews," and "[d]efendants may still reach the plaintiff's relevant medical records," may conduct depositions, and "plaintiff's

---

[11] MultiCare had retained counsel to jointly represent it, the physician who treated the plaintiff, and the physician's employer, Trauma Trust, which was an entity created by MultiCare, even though the physician and his employer were not defendants to the action, and filed a motion for a protective order allowing it to have ex parte communications with the physician. Hermanson, 196 Wn.2d at 583. As discussed above, the court nonetheless ruled that MultiCare could engage in ex parte contact with the physician, limited to the facts of the alleged negligent event, because under Youngs, the physician was the functional equivalent of an employee, and, thus, was protected by the corporate attorney-client privilege. Id. at 590.

counsel may agree to an informal interview with both counsel present." 110 Wn.2d at 680.

VMMC has not established any basis for disregarding the Loudon rule as applied to its communications with its former employees and nonparty fact witnesses, Drs. Aranson, Chew, or Downey. The trial court did not err in determining that VMMC's ex parte communications with Snyder's physicians violated Loudon.

## II.     Sanctions for *Loudon* Violations

As the trial court properly determined VMMC had engaged in ex parte contact in violation of Loudon, we next address Snyder's challenge to the trial court's denial of his motion for default judgment as a sanction, but limited to the issue on which the commissioner allowed briefing: "whether a showing of prejudice is required for sanctions for Loudon violations."

After the court concluded that VMMC had violated Loudon, Snyder filed a motion for default judgment. The trial court denied the motion without prejudice, stating that "based upon the information contained within the record, at this time, this court lacks the information to determine if the violation substantially prejudiced plaintiff." Snyder contends the trial court improperly required him to prove prejudice in order to sanction VMMC for its Loudon violations. VMMC argues that prior case law establishes that the moving party bears the burden of demonstrating prejudice for sanction.

20

We review a trial court's decision regarding sanctions for discovery violations for abuse of discretion. Magana v. Hyundai Motor Am., 167 Wn.2d 570, 582-83, 220 P.3d 191 (2009). A trial court abuses its discretion if its decision is manifestly unreasonable or based on untenable grounds or untenable reasons. J.K. by Wolf v. Bellevue Sch. Dist. No. 405, 20 Wn. App. 2d 291, 303, 500 P.3d 138 (2021). We review de novo whether a trial court applied the correct legal standard in assessing sanctions for a discovery violation. Id. at 303. A trial court's decision is an abuse of discretion if based on an incorrect legal standard or the facts do not meet the requirements of the correct legal standard. In re Marriage of Littlefield, 133 Wn.2d 39, 47, 940 P.2d 1362 (1997).

In Smith, the plurality opinion concluded that rather than presuming prejudice, a plaintiff must prove prejudice for sanctions due to Loudon violations:

> In our view, the more reasonable approach is for the trial court to determine, on the basis of the particular circumstances before it, whether the plaintiff suffered actual prejudice from defense counsel's prohibited ex parte contact with a nonparty treating physician or the physician's counsel and to impose a remedy that is appropriate to the degree of prejudice.

170 Wn.2d at 672. This would require the moving party to show actual harm from the violation. Id. The plurality reasoned, "[i]t makes sense for the moving party to carry the burden of proof on this issue because that party has the greatest interest in perceiving and defending against prohibited ex parte contact between opposing counsel and a nonparty treating physician." Id.

Snyder notes correctly that two justices in Smith found no Loudon violation and did not reach the issue of the proper burden of proof. Smith, 170 Wn.2d at

21

674-77 (Fairhurst, J., concurring, joined by Madsen, J.). And four justices concurred that there was a <u>Loudon</u> violation, but dissented as to the correct burden. <u>Id.</u> at 678-79 (C. Johnson, concurring in part and dissenting in part). The dissenting judges reasoned that the plaintiff "has the least control over preventing the harm to begin with," so when there is a violation, the remedy is to grant a new trial. <u>Id.</u> at 678-79.

The <u>Smith</u> plurality opinion, however, cites to several Court of Appeals cases in support of the need to show prejudice in order to obtain sanctions for <u>Loudon</u> violations. 170 Wn.2d at 671-72 (citing the same case below, <u>Smith v. Orthopedics Intern., Ltd.</u>, 149 Wn. App. 337, 343, 203 P.3d 1066 (2009); <u>Ford v. Chaplin</u>, 61 Wn. App. 896, 899, 812 P.2d 532 (1991); and <u>Rowe v. Vaagen Bros. Lumber, Inc.</u>, 100 Wn. App. 268, 278-80, 996 P.2d 1103 (2000)). In each of these cited cases, the court considered prejudice without explicitly stating that the plaintiff bore the burden to show it. In <u>Rowe</u>, the court held the redaction of certain portions of trial testimony after a <u>Loudon</u> violation was not an effective cure for inherent prejudice that had already occurred. 100 Wn. App. at 278-80. In <u>Ford</u>, counsel for the party who had suffered the <u>Loudon</u> violation had not explored the communication at trial, "even by way of an offer of proof to preserve the issue for appeal," and no deposition was in the record, so there was no basis for comparing testimony after the ex parte contact. 61 Wn. App. at 899. Thus, the court held although there was error, it was harmless where the record did not permit determination of "whether the ex parte contact materially prejudiced the

plaintiff's case." Id. And in Smith, the Supreme Court agreed with the Court of Appeals that "there are circumstances where such a violation does not affect the fundamental fairness or outcome of a trial." 170 Wn.2d at 672.

As VMMC notes, sanctions for discovery violations generally require a showing that the failure to comply "substantially prejudiced the opponent's ability to prepare for trial." Burnet v. Spokane Ambulance, 131 Wn.2d 484, 494, 933 P.2d 1036 (1997). As a Loudon violation is a type of discovery violation, the same showing of prejudice should be required for sanctions. We see no basis for crafting a different standard that shifts the burden to the party that violated the rule for every Loudon violation. The effect of a Loudon violation will be highly fact-specific. A showing of prejudice will depend on when the violation occurred, the degree of the violation (e.g., sending one public document to the physician versus extensive meetings and coaching sessions with a physician witness), and the stage of litigation (e.g., prior to any depositions or mid-trial).

We therefore conclude that the plaintiff bears the burden of establishing that the violation resulted in prejudice. This standard is in accord with other types of violations and enables the trial court, who is in the best position to assess the degree of prejudice, to determine the appropriate sanction in its discretion.

III.    Quality Improvement (QI) Privilege

The commissioner granted Snyder permission to brief "whether and to what extent a QI committee member's participation in the litigation precludes the hospital's assertion of the QI privilege." His brief phrases the issue as "[w]hether

documents provided to a QI committee that do not reflect the 'inner workings' of the committee are protected from discovery when defendant has not screened QI members from participants in litigation over the care at issue?" Snyder contends that QI committee members were not screened from litigation and defense counsel, and therefore, VMMC waived its QI privilege and could not properly withhold records. VMMC argues that the QI immunity is "un-waivable" and that the court properly denied Snyder's request for production of QI-protected materials.

Every hospital must maintain a QI program, including a QI committee with "the responsibility to review the services rendered in the hospital . . . in order to improve the quality of medical care of patients and to prevent medical malpractice." RCW 70.41.200(1)(a). The QI committee "oversee[s] and coordinate[s] the quality improvement and medical malpractice prevention program and shall ensure that information gathered pursuant to the program is used to review and to revise hospital policies and procedures." RCW 70.41.200(1)(a).

"To ensure a candid discussion about the quality of health care by hospitals, the legislature shielded from discovery a hospital's quality review committee records." Lowy v. PeaceHealth, 174 Wn.2d 769, 775, 280 P.3d 1078 (2012). Thus, documents "created specifically for, and collected and maintained by, a quality improvement committee are not subject to disclosure . . . or discovery or introduction into evidence in any civil action." RCW 70.41.200(3). As

"the majority of records a hospital creates might be somehow related to the quality of care it provides," the exemption in RCW 70.41.200(3) "serves as a legislative limit on the protection and prevents a hospital from 'funneling records through its [QI] committee' to prevent disclosure." Seattle Children's Hosp. v. King County, 16 Wn. App. 2d 365, 375, 483 P.3d 785 (2020) (quoting Fellows v. Moynihan, 175 Wn.2d 641, 655, 285 P.3d 864 (2012)). This protection includes only "documents *created as part of* the inner workings of the committee" and does not include information that merely "goes into or comes out of the [QI] committees." Lowy, 174 Wn.2d at 787 (emphasis added).

Snyder's argument stems from Youngs. In Youngs, defendants argued that because the QI statute required them to collect information concerning their patients' negative health care outcomes and protected that information from discovery, the Loudon rule could not be applied to prevent them from communicating with hospital employees. Youngs, 179 Wn.2d at 668-69. The court disagreed, noting first that the QI requirements and privilege and Loudon "have coexisted, apparently successfully, for over 25 years." Id. at 669. The solution described by the Youngs court was not to override Loudon and allow ex parte contact with nonparty hospital employee witnesses, but to screen QI committee members from defense counsel:

> The QI statute precludes restrictions on communications between a hospital's QI committee and its physicians, but the committee members can be screened from defense counsel in a malpractice action. Such screening will preserve Loudon's protections for patient-plaintiffs, while also allowing hospitals to meet statutory requirements for quality improvement. This screening preserves the

25

integrity of the QI process, allowing the QI committee to meet its statutory requirement to collect and maintain information "specifically for" QI purposes.

Youngs, 179 Wn.2d at 669.

According to Snyder, VMMC did not screen CMO Dr. Glenn, from this litigation or from defense counsel.[12] VMMC's privilege log shows Dr. Glenn as a participant in a QI committee meeting on July 23, 2018. Yet Dr. Glenn also met ex parte with Dr. Chew, along with Dr. Chew's counsel, after the litigation commenced. VMMC's witness list also included "Michael Glenn, MD *and/or* current VMMC Representative." Thus, Snyder contends, VMMC cannot assert any QI privilege in this case. VMMC responds that there is no evidence that Dr. Glenn provided any QI-protected information to Dr. Chew or had any influence on his later testimony. Dr. Glenn provided a declaration attesting that his 20 to 30 minute meeting with Dr. Chew and his counsel was limited to explaining why Dr. Chew had a lawyer separate from VMMC and expressing support, and he did not discuss the surgical case with Dr. Chew.

Snyder's waiver argument is overly sweeping and unavailing. As noted above, the purpose of the screening proposed in Youngs is two-fold: to ensure hospitals can meet their statutory requirements under the QI statute, and also to preserve Loudon protections by preventing defense counsel from ex parte

---

[12] Initially, Snyder also asserted that VMMC did not screen its risk manager, Pat Nishikawa, and that Nishikawa was passing information between the QI committee and litigation counsel. But the only evidence in the record on this point, the declaration of VMMC Director of Risk Management Operations Karen Markwith, indicates that Nishikawa was not a participant in any QI committee that reviewed the care in this case.

communications with committee members. <u>Youngs</u> proposes screening as a possible preventative for ex parte communications, but does not require it under threat of waiver of the privilege. If this screening is not done, and the result is a <u>Loudon</u> violation, then the trial court must determine the proper remedy based on the nature of the prejudice and the particular circumstances.

We cannot say that a failure to screen warrants a complete waiver of the QI privilege for all evidence as to which the privilege is asserted. On this record, the trial court properly upheld VMMC's assertion of the QI privilege and properly did not compel disclosure of the documents.[13]

IV.    <u>Fees on Appeal</u>

VMMC requests an award of attorney fees "incurred in researching and responding to Mr. Snyder's requests for relief that were not accepted for review." According to VMMC, Snyder violated RAP 2.4(a) and fees are warranted under RAP 18.9(a), which allows for sanctions for failure to comply with the Rules of Appellate Procedure. In support, VMMC cites <u>Pugel v. Monheimer</u>, 83 Wn. App. 688, 693, 922 P.2d 1377 (1996), where Monheimer failed to timely file a cross-appeal but submitted a brief assigning error and making claims for relief in violation of RAP 2.4(a). Pugel responded to the claims for relief in his reply brief. The court noted that Pugel could have moved to strike the brief, but awarded

---

[13] We do not address Snyder's additional arguments that the trial court erred in failing to order additional production of documents either to him or for in camera review, as the grant of discretionary review did not include those issues. Snyder is not precluded from challenging VMMC's assertion of QI privilege as to specific information or documents, or from seeking sanctions upon a showing of prejudice, if additional information is discovered that would support such requests.

fees because "unquestionably Monheimer's violation of the rules caused more work for Pugel." Id. Snyder claims that Pugel is inapposite because unlike the party in Pugel, he timely sought review and submitted a brief addressing the issues on review "that will remain in the case regardless" because of the continuing litigation.

VMMC fails to identify with precision the briefing that exceeds the issues accepted for review. We therefore decline to award VMMC the requested fees on appeal.

## CONCLUSION

We affirm the trial court's conclusion that the Loudon rule prohibited ex parte contact between VMMC and the nonparty physicians and that a party seeking sanctions for a Loudon violation must establish prejudice. We further conclude that the failure to screen a QI committee member from litigation does not result in automatic waiver of the protection afforded to all evidence protected from discovery under the QI statute. Finally, as this case is here on interlocutory review, we remand to the trial court for further proceedings.

Cheng, J.

WE CONCUR:

Birk, J.

Smith, C.J.